Filed 10/22/14  Modified and Certified for Publication 11/17/14 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Daniel B. et al., Persons Coming Under the Juvenile Court Law. | B254274 |
| | (Los Angeles County Super. Ct. No. DK00453) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANGELA B., Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Sherri Sobel, Juvenile Court Referee.  Reversed in part and remanded.

Debra Dentler, under appointment by the Court of Appeal, for Defendant and Appellant.

John F. Krattli, County Counsel, Dawyn R. Harrison, Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Plaintiff and Respondent Los Angeles County Department of Children and Family Services.

_____

Appellant Angela B. (Mother) appeals from the juvenile court's disposition order declaring two of her children dependents of the court pursuant to Welfare and Institutions Code[1] section 300, subdivisions (a), (b), and (j), removing them from the custody of their father, and releasing them to Mother with family maintenance services. Mother contends that the juvenile court erred in ordering her to participate in a domestic violence support group for an open-ended period, and in delegating to the program's counselors the authority to decide how long she would be required to attend the program. For the reasons set forth below, we reverse this portion of the disposition order and remand the matter to the juvenile court to conduct further proceedings consistent with this opinion.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Initiation of the Dependency Proceedings

Mother and Daniel B. Sr. (Father) are the married parents of two young children—Daniel B. Jr. (Daniel) (born June 2012) and Damian B. (born October 2013).[2] Mother also has an older son, Andrew A. Jr. (born May 2003), from a prior relationship. Mother and the children lived with Father in a small two-bedroom home, which was located on a property owned by the paternal grandparents. This matter came to the attention of the Department of Children and Family Services (DCFS) in August 2013 following a report of domestic violence in the family's home.

On August 9, 2013, emergency response personnel were called to the home after Father stabbed Mother in her left shoulder with a knife. At the time, Mother was 29-weeks pregnant with Damian. When officers arrived on the scene, they observed that the master bedroom and the kitchen were in disarray with broken furniture and other broken items lying on the floor. Mother was crying and bleeding from her shoulder. After being transported to the hospital for treatment, Mother was interviewed by the police. She told the officers that, earlier in the evening, she and Father were arguing about his past and

---

[1] All further statutory references are to the Welfare and Institutions Code.

[2] Father is not a party to this appeal.

2

present drug use. Father became angry and pushed Mother against the bedroom furniture. Father then grabbed one-year-old Daniel and attempted to leave the home with him. Mother believed that Father was under the influence of methamphetamine, and fearing that he might hurt Daniel, she took the baby from him. In response, Father grabbed a kitchen knife, broke off the tip of the knife on the countertop, and stabbed Mother once in her left shoulder as she was holding Daniel. Father then fled the home. The police also interviewed two adult relatives who had witnessed the altercation. They similarly reported that Mother and Father were arguing in the kitchen when Father grabbed a knife and stabbed Mother in her left shoulder as she was holding Daniel. The following day, accompanied by Mother and the maternal grandparents, Father turned himself in at the local police station and was taken into custody.

On August 11, 2013, the DCFS interviewed the family about the incident. Mother reported that she and Father had been married for four years, and over the course of their relationship, Father had pushed her several times during verbal altercations. Mother stated that Father would place his open hands against her chest and push her when he became angry, and that on several occasions, he caused her to fall back onto the bed. She denied that there had been any other forms of domestic violence prior to the August 9, 2013 incident. Mother stated that, on that occasion, Father began arguing with her and accusing her of infidelity in a loud voice. The paternal grandparents and other relatives who lived next door overheard the argument and came to the home to try to calm Father. Mother and Father continued arguing in their bedroom as she held Daniel in her arms. They then moved into the kitchen and a family member took Daniel from her. While arguing in the kitchen, Father grabbed a knife from the counter and stabbed Mother on her left shoulder blade. She denied that she was holding Daniel when Father stabbed her. She also denied any personal history of drug use, but stated that she suspected Father was using drugs based on his behavior. Mother expressed that she was willing to cooperate with the DCFS to ensure the safety and well-being of her children, and would not allow Father back in the home if he were released from custody.

3

In his interview with the DCFS, Father denied any history of domestic violence with Mother, including any prior incidents of pushing her. Father stated that the first time he assaulted Mother was on August 9, 2013, when he stabbed her on her shoulder during a verbal altercation. According to Father, he and Mother had been arguing about his belief that Mother was ignoring him and wanted to leave him. Family members who heard the argument soon arrived at the home. Mother was holding Daniel while she and Father argued in the bedroom, but she handed him to a family member as the argument continued into the kitchen. At that point, Father grabbed a knife from the kitchen counter and stabbed Mother on her left shoulder. He then left the home, but later talked to Mother and agreed to turn himself in to the authorities. Father admitted that he had a 13-year history of using crystal methamphetamine, and that he last used the drug on August 5, 2013 when he was outside the home. Father denied ever using drugs in the home or in the presence of the children. Father indicated that he was willing to comply with the DCFS in an effort to reunite with his family.

The case social worker also interviewed 10-year-old Andrew, who confirmed that he was present in the home during the domestic violence incident. Andrew recounted that he and Daniel were in their bedroom with paternal relatives while Mother and Father were arguing in the master bedroom and then in the kitchen. He later observed that Mother was in pain, but he did not see how she was injured. Andrew denied ever witnessing Mother and Father engage in any physical altercations. He stated that he was not fearful of either parent, and he wanted to remain living with Mother, but he did not know if he wanted Father to return home at that time. The case social worker observed that both Andrew and Daniel were clean, dressed appropriately, and appeared to be in good physical health with no signs of neglect or physical abuse.

In addition to these interviews, the DCFS spoke with three paternal relatives who were present in the home during the altercation. They similarly reported that Mother and Father argued in the master bedroom and kitchen while Andrew and Daniel stayed in their room with other family members. They also stated that, after the argument moved into the kitchen, Father stabbed Mother on her shoulder with a knife and then fled the

4

home. Each of these relatives denied knowledge of any drug use by the parents or prior incidents of domestic violence between them. The DCFS also spoke with two maternal relatives who stated that they were unaware of any domestic violence or drug use in the home, and had no concerns about the care of the children.

## II.    Section 300 Petition on Behalf of Andrew and Daniel

On August 14, 2013, the DCFS filed a dependency petition on behalf of Andrew and Daniel under section 300, subdivisions (a) and (b). The petition alleged that Father and Mother had a history of engaging in violent altercations in the children's presence, including the August 9, 2013 stabbing incident, and that Mother had failed to protect the children by allowing Father to reside in the home and have unlimited access to them. It also alleged that Father had a history of illicit drug use and was a current user of methamphetamine, and that he had been under the influence of the drug on prior occasions while Daniel was under his care and supervision.

At the August 14, 2013 detention hearing, the juvenile court ordered that Daniel be detained from Father and that both Andrew and Daniel remain released to Mother under the supervision of the DCFS. The court granted Father monitored visitation with Daniel a minimum of three times a week. The matter was set for a contested jurisdiction and disposition hearing.

## III.    October 16, 2013 Jurisdiction/Disposition Report

In its October 16, 2013 Jurisdiction/Disposition Report, the DCFS stated that the children remained in the care of Mother. Father had been released from jail, but was currently homeless and residing in his car due to a criminal restraining order issued against him. In preparing the report, the dependency investigator conducted individual interviews with the family about the allegations in the section 300 petition.

In his interview, Father maintained that the stabbing on August 9, 2013 was the first time that he and Mother had engaged in a physical altercation. Father explained that he and Mother used to argue a lot about money because he was unemployed and had to stay home with the children while Mother worked. Mother controlled the money and

5

would tell Father that he was "worth nothing." They also argued because Father felt that Mother did not pay attention to him. He dealt with the stress of the situation by using drugs, and he last used methamphetamine four days before the stabbing. On the day of the stabbing, Father was upset because he believed Mother was going to leave him and take Daniel with her. He admitted that he stabbed Mother during an argument, but insisted it was an accident. Father also disclosed that he had been using drugs since he was 18 years old and had used cocaine, rock cocaine, and crystal methamphetamine. He stopped using drugs for several years, but then relapsed after Daniel's birth. Father told the dependency investigator, "I can't say that I wasn't using drugs while I was taking care of my kids, but it doesn't mean I couldn't take care of my kids. I was never that high. I was still paying attention to them." Father stated that he wanted the best for his children and was willing to do whatever was necessary to get back his family.

Mother told the dependency investigator, "The domestic violence was usually in the form of us arguing, but when I would ignore him is when he would push me. We would argue when the kids were sleeping." Mother recounted that, on the day of the stabbing, she told Father that she wanted to leave him and began packing her belongings. The confrontation escalated when Mother said that she was taking Daniel with her and Father tried to block her from leaving. Mother continued to report that a family member took Daniel from her arms before the stabbing. She also said that, when she saw Father holding a knife, her only concern was for the children. As Mother described, "My first reaction was okay, you are not going to get to the kids. I thought he was going to try to take the baby. All I could think was that he was going to have to go through me before getting to the baby or Andrew. That is when I got in front of him. I wasn't thinking about me at all. He stabbed me on my left shoulder and took off running." Mother maintained that she did not know Father had a history of drug abuse until a few years after they were married. She also stated that she assumed Father was on drugs the day of the stabbing based on his behavior, but she had no reason to suspect he had begun using drugs again until that day. Both Mother and Father conveyed that they believed they could benefit from marriage and family counseling.

6

In his interview, Andrew repeated his prior statement that he and Daniel were in their bedroom with other family members during the incident. Andrew said that he came out of the bedroom when he heard Mother scream, and that he saw Father leaving the home and Mother lying on her bed with an injury. Andrew had not had any contact with Father since that day, and denied any knowledge of drug use in the home. The dependency investigator also spoke with Andrew's father, who usually saw his son on the weekends under an informal custody arrangement with Mother. Andrew's father was not aware of any prior incidents of domestic violence between Mother and Father, and never suspected that Father was using drugs.

The DCFS recommended that the juvenile court dismiss Andrew from the petition, declare Daniel a dependent of the court, and order that both children remain placed in the care of Mother. The agency noted that there were no safety concerns that would warrant the removal of the children from Mother, but it would be premature to release Daniel to Father or to allow Father to reside in the family's home given his unresolved issues with domestic violence and drug abuse. The agency also noted that jurisdiction was necessary to ensure that Mother had a clear understanding of the cycle of domestic violence and was linked to supportive services since both parents had expressed a desire to reconcile. The DCFS accordingly recommended that the juvenile court order family reunification services for Father and family maintenance services for Mother. The proposed services for Mother included parenting education, individual counseling, family preservation services, and a domestic violence program for victims.

## IV. Section 300 Petition on Behalf of Damian

Mother's third child, Damian, was born in October 2013. On December 20, 2013, the DCFS filed a section 300 petition on the child's behalf under section 300, subdivisions (a), (b), and (j). The petition alleged that Damian was at substantial risk of harm due to the parents' history of engaging in violent altercations, including the August 9, 2013 stabbing incident which occurred while Mother was pregnant with the child. The petition also alleged that Damian was at risk based on Father's history of drug

7

abuse and current use of methamphetamine. At a December 20, 2013 detention hearing, the juvenile court ordered that Damian be detained from Father and remain released to Mother. The court also ordered monitored visitation for Father as long as the visits did not conflict with any criminal protective orders. A contested jurisdiction and disposition hearing for both petitions was set for January 31, 2014.

On January 31, 2014, the DCFS submitted a Jurisdiction/Disposition report for the section 300 petition filed on behalf of Damian. The report reflected that, on August 13, 2013, Father pleaded no contest to charges of assault with a deadly weapon and willful cruelty to a child. The report also showed that, on October 25, 2013, the criminal court issued a protective order, which permitted Father to be in the presence of Mother and the children, but required that his contact be peaceful. The DCFS recommended that Damian be declared a dependent of the juvenile court and remain placed in Mother's care. The agency continued to recommend that the court order family reunification services for Father and family maintenance services for Mother.

## V.     Jurisdiction and Disposition Hearing

On January 31, 2014, the juvenile court held the jurisdiction and disposition hearing. At the DCFS's request, the court dismissed Andrew from the section 300 petition filed on his behalf and then proceeded with the adjudication of the petitions filed on behalf of Daniel and Damian. Counsel for the DCFS and counsel for the children joined in requesting that the petitions be sustained as pled. Mother's counsel asked the court to strike the language in the petitions alleging that she failed to protect the children from the risk of harm posed by Father. Father's counsel asked the court to dismiss the counts alleged under section 300, subdivision (a) concerning Father's domestic violence and the counts alleged under section 300, subdivisions (b) and (j) concerning Father's drug use. The juvenile court sustained the petitions filed on behalf of Daniel and Damian as pled, with one amendment reflecting that Father was convicted, rather than arrested, on a charge of assault with a deadly weapon. The court declared Daniel a dependent of the

8

court under section 300, subdivisions (a) and (b), and Damian a dependent of the court under section 300, subdivisions (a), (b), and (j).

Proceeding to disposition, the juvenile court ordered that both Daniel and Damien be removed from the custody of Father and remain placed in the home of Mother under the supervision of the DCFS. With respect to family maintenance services for Mother, her counsel asked the court: "Your Honor, I am requesting that Mother be allowed to do individual counseling to address domestic violence through Family Preservation. Family Preservation has already been in the home. I believe the [DCFS] wants Mother to do a separate domestic violence, and parenting as well. I don't believe parenting is necessary as well. These children have been with the mother without incident. There is no indication that she is neglectful or any issue regarding her parenting of these children." The court stated: "Not a chance. She needs to be in a group. She needs to have other people saying to her, you let him back in and you let him back in and you let him back in. That doesn't happen . . . with Family Preservation. They are very nice people. They will do individual. No, no, no. She needs to be in a group." The court also noted that it would not be ordering conjoint counseling with Father "until the domestic violence treatment program tells me that that is okay to do." The court then ordered Mother to attend a support group for victims of domestic violence, a parenting class, and individual counseling.

Counsel for the DCFS asked the juvenile court if it could clarify the duration of the domestic violence program for Mother. The court responded: "No. . . My friends who do this for a living say that you can order a 52-week domestic violence treatment program for a father. You cannot order support group. That is why when I re-wrote this case plan, that is why we didn't put a time limit in." Counsel for the DCFS explained that he was seeking clarification because, in his experience, a 26-week program would be requested "down the road." The court replied: "No. This is up to the domestic violence treatment program and the domestic violence counselors to say how long Mother needs to be in. They may say four weeks. . . . They may say a hundred. That is their call, but it's got to be a group."

9

After making disposition orders with respect to Father, the juvenile court told Mother: "You are hanging by a thread with these kids. If there is any contact with this man, I guarantee you somebody is going to tell the [DCFS], and, if that is the case, your kids are gone. Got it?" Mother's counsel stated that she was noting "Mother's objection to the jurisdictional and dispositional findings." Following the hearing, Mother filed a timely notice of appeal from the juvenile court's jurisdiction and disposition orders.[3]

## DISCUSSION

On appeal, Mother challenges the portion of the juvenile court's disposition order requiring her to participate in a support group for victims of domestic violence. She specifically asserts that the juvenile court abused its discretion in ordering her to attend an open-ended series of group discussion sessions with other domestic violence victims rather than a time-limited domestic violence education class. She also argues that the juvenile court abused its discretion in delegating the authority to determine the duration of her participation in the support group to the program's counselors.

## I.    Forfeiture

As a preliminary matter, we address the DCFS's contention that Mother forfeited her right to argue on appeal that she should have been ordered to attend either a domestic violence education class or a fixed number of domestic violence support group sessions because she failed to raise those objections to the disposition order in the juvenile court. "[A] reviewing court ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]" (*In re S.B.* (2004) 32 Cal.4th 1287, 1293, fn. omitted.) In

---

[3]    At a section 364 review hearing held on August 1, 2014, the juvenile court continued its jurisdiction over both Daniel and Damian and ordered that the children remain placed in the home of Mother under the same plan of family maintenance services.

addition, "[g]eneral objections are insufficient to preserve issues for review.  [Citation.]  The objection must state the ground or grounds upon which the objection is based.  [Citation.]"  (*In re E.A.* (2012) 209 Cal.App.4th 787, 790.)

The record in this case reflects that, at the jurisdiction and disposition hearing, Mother's counsel specifically objected to the portion of the proposed case plan that required Mother to participate in a domestic violence support group, and requested that Mother instead be allowed to address the issues of domestic violence in individual counseling.  In response, the juvenile court made clear that it would not consider any alternative to a support group.  As the juvenile court was ordering Mother to participate in a support group for victims of domestic violence as well as other programs, counsel for the DCFS interjected and asked for clarification on the length of the domestic violence program.  The court responded that it deliberately had chosen to not put a time limit on Mother's participation in the support group, leaving it instead to the program's counselors.

On this record, we conclude that Mother's objection to the order requiring her to participate in a domestic violence support group was sufficient to preserve the issues raised on appeal.  Based on the objection made by Mother's counsel and the follow-up inquiry by counsel for the DCFS, the juvenile court had an opportunity to consider the type and duration of the domestic violence program that it was ordering for Mother, as well as the discretion that the program would have in setting the terms of Mother's participation.  The juvenile court clearly stated on the record that it would not order any type of domestic violence program for Mother other than a victims' support group, nor would it specify the number of support group sessions that Mother was required to attend.  Any further objection to the terms of the order by Mother's counsel would have been futile.  Under these circumstances, Mother has not forfeited her arguments on appeal.

II.     **Order for Mother to Attend a Domestic Violence Victims Support Group**

"'The juvenile court has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly.  On appeal,

this determination cannot be reversed absent a clear abuse of discretion.' [Citation.]
(*In re A.E.* (2008) 168 Cal.App.4th 1, 4.) Under section 362, "[i]f a child is adjudged a
dependent child of the court, . . . and the court orders that a parent or guardian shall
retain custody of the child subject to the supervision of the social worker, the parents or
guardians shall be required to participate in child welfare services or services provided
by an appropriate agency designated by the court." (§ 362, subd. (c).) Additionally,
"[t]he juvenile court may direct any and all reasonable orders to the parents or guardians
of the child who is the subject of any [dependency] proceedings . . . as the court deems
necessary and proper to carry out the provisions of this section," including orders "to
participate in a counseling or education program." (§ 362, subd. (d).) The case plan
ordered by the court should be appropriate for each individual family based on facts
relevant to that family, and should be designed to eliminate the conditions that led to the
dependency in the first instance. (*In re Nolan W.* (2009) 45 Cal.4th 1217, 1229; see also
§ 362, subd. (d) ["[t]he program in which a parent . . . is required to participate shall be
designed to eliminate those conditions that led to the court's finding that the child is a
person described by Section 300"].)

Mother contends that the juvenile court erred in ordering her to participate in a
domestic violence support group for an indeterminate period because such order was
neither requested by the DCFS nor supported by the evidence. Mother acknowledges
that a "time-limited program of domestic violence education" may have been appropriate
based on the August 9, 2013 incident, but argues that a "broad, open-ended series of
group discussion sessions with other domestic violence victims" was not. Contrary to
Mother's characterization, however, the altercation during which Father stabbed Mother
was not the first incident of domestic violence between them. Mother disclosed to the
DCFS that Father had pushed her on several prior occasions during arguments, and at
times, he pushed her with enough force to cause her to fall back onto the bed. Mother
also explained that Father would push her when she tried to end an argument by ignoring
him, and although Father would eventually calm down, the cycle would repeat itself the
following day. In addition, Mother admitted that these verbal and physical altercations

12

typically occurred while the children were in the home sleeping. Based on these facts, the juvenile court reasonably could have found that Father and Mother had a history of engaging in acts of domestic violence in the home, which escalated to the point of Father stabbing Mother when she tried to leave him.

The juvenile court also reasonably could have found that Mother was attempting to minimize the seriousness of the domestic violence and its impact on the children in her interviews with the DCSF. Shortly after the stabbing, Mother and two other family members told law enforcement officers that Mother was holding Daniel in her arms when Father stabbed her. However, by the time the DCFS interviewed Mother and the paternal relatives about the incident, they were reporting that Mother was not holding the child at the time and that he was in another room. The juvenile court disbelieved this subsequent account in sustaining the dependency petitions, and found that one-year-old Daniel was in Mother's arms when she was stabbed. Moreover, even assuming that neither Daniel nor Andrew witnessed the stabbing first-hand, both children were present in the home during the ongoing altercation between the parents, which was loud enough to attract the attention of relatives outside the home. Ten-year-old Andrew also reported that he came out of his room when he heard Mother scream and observed that she was injured and in pain. In addition, it is undisputed that Mother was seven-months pregnant with Damian at the time of the stabbing and that he was at risk of serious injury during the incident.

Given that both Mother and Father expressed a desire to reconcile their marriage by the time of the jurisdiction and disposition hearing, the juvenile court acted reasonably in concluding that Mother's participation in a group program for victims of domestic violence was necessary to ensure the safety of the children. While Mother does not dispute that an order requiring her to attend some type of domestic violence program was appropriate, she asserts that the juvenile court should have selected a domestic violence education class rather than a support group. However, Mother fails to explain how she would have benefited more from a class on domestic violence than from a support group for victims of domestic violence. She also fails to explain how ordering a domestic violence class would have been more consistent with the DCFS's recommendation that

13

Mother participate in a "domestic violence program for victims" than the juvenile court's order that she participate in a domestic violence support group. Section 362 affords the juvenile court broad discretion to order the parent of a dependent child "to participate in a counseling or education program," so long as the program is designed to eliminate the conditions that led to the dependency in the first instance. (§362, subd. (d); see also *In re Nolan W.*, *supra*, 45 Cal.4th at p. 1229; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.) Based on the history of domestic violence in the home and the seriousness of the altercation that led to these dependency proceedings, Mother has failed to show an abuse of discretion in the type of domestic violence program selected by the juvenile court.[4]

This brings us to the question of whether the juvenile court abused its discretion in failing to set a time limit on Mother's participation in the domestic violence support group, or to articulate criteria for determining how long she would be required to attend. Mother argues that it was unreasonable for the juvenile court to order her to participate in an open-ended program of support group sessions that, in the court's own words, might last four weeks or 100 weeks. The DCFS counters that the juvenile court's refusal to specify the number of support group sessions that Mother was required to attend was appropriate because the court reasonably could condition the length of Mother's participation in the group on the progress that she achieved during the sessions.

The juvenile court did not abuse its discretion by leaving the term of Mother's enrollment in a domestic violence support group open ended. Section 362 does not require a juvenile court to place a time limit on a parent's participation in a counseling or education program. It simply requires that the order be "reasonable" in nature and

---

[4]     Mother contends that the juvenile court improperly based its order for a domestic violence support group on the out-of-court statements of the court's personal friends, who suggested to the court that victims of domestic violence need group sessions. While the court's statements on this issue are somewhat ambiguous, "'"[i]t is judicial action and not judicial reasoning which is the subject of review"'" on appeal. (*In re Jonathan B.* (1992) 5 Cal.App.4th 873, 876.) In this case, the juvenile court's decision to order Mother to participate in a domestic violence support group (as opposed to a domestic violence education class) was a valid exercise of the court's discretion.

14

"designed to eliminate the conditions" that led to the child being declared a dependent of the court. (§ 362, subd. (d); see also *In re Nolan W.*, *supra*, 45 Cal.4th at p. 1229.) The California Supreme Court accordingly has held that an order requiring a parent to attend a counseling program for an open-ended period as a condition of visitation is not beyond the authority of the juvenile court, nor does it deprive the parent of due process of law. (*In re Chantal S.* (1996) 13 Cal.4th 196, 208-212.) As the Supreme Court observed, "the dependency scheme includes 'carefully crafted due process protections . . . that insure that parental rights are protected along with the physical and mental health of children.' [Citation.]" (*Id*. at p. 212.) The juvenile court thus reasonably could decline to set a time limit on Mother's participation in the support group, and retain the discretion to terminate its order once Mother had made sufficient progress in addressing case issues.

While we see no abuse of discretion in an order for an open-ended domestic violence program, we are concerned that the juvenile court appeared to delegate to the program's counselors the sole discretion to decide the length of Mother's participation. The record reflects that, in response to the DCFS's inquiry about the duration of the domestic violence program ordered for Mother, the court did not simply state that it was leaving the term of Mother's participation in the program open ended or subject to the court's own discretion. Rather, the court stated that it was "up to the domestic violence treatment program and the domestic violence counselors to say how long Mother needs to be in" the support group, and that "it was their call." In delegating that authority to the program, the court also did not provide any criteria for determining the length of Mother's participation, nor did it establish any guidelines for the program to follow in evaluating Mother's progress. Instead, based on its statements at the hearing, the court appeared to leave the determination of an end date for Mother's participation, as well as the basis for that determination, entirely in the hands of the program's counselors.

The DCFS suggests that, in making these statements at the disposition hearing, the juvenile court merely was requiring that the length of Mother's participation in the support group be determined by her progress in the program, as evaluated by the program's counselors. We agree that the juvenile court has the discretion to make the

15

duration of Mother's participation in the program contingent on her progress. The court also has the discretion to rely on the reports and recommendations of the program's counselors, as well as any other relevant evidence, in deciding at what point Mother has made sufficient progress in the program to cease her participation. However, the final determination of when Mother has satisfactorily completed this portion of her case plan must be made by the juvenile court, not by the program's counselors. (Cf. *In re James R.* (2007) 153 Cal.App.4th 413, 443 [reversing order delegating all decisions on visitation to private placement program because "juvenile court did not make an individualized determination based upon the application of the program's policies to this minor, but appears to have completely deferred to the program the question of visitation"]; *In re Donnovan J.* (1997) 58 Cal.App.4th 1474, 1478 [reversing order prohibiting visitation without permission of minors' therapists because while juvenile court "may base its determination of the appropriateness of visitation on input from therapists, it is the court's duty to make the actual determination"].)

Although the juvenile court's written order does not make any reference to the role of the domestic violence counselors in setting the terms of Mother's participation in the program, the court's statements at the disposition hearing indicate that it was not merely directing the counselors to provide regular feedback on Mother's progress or to make recommendations concerning her continued attendance. Rather, the court was granting the program's counselors unfettered discretion to decide, based on their own criteria, when Mother had satisfied this component of her court-ordered case plan. In light of these statements, we conclude that the proper remedy is to reverse this portion of the disposition order and remand the matter to the juvenile court to issue a new order for a domestic violence program for Mother under terms consistent with this opinion.

16

## DISPOSITION

The juvenile court's order requiring Mother to participate in a domestic violence victims' support group is reversed and the matter is remanded to the juvenile court for further proceedings consistent with this opinion.

ZELON, J.

We concur:

PERLUSS, P. J.

SEGAL, J.*

---

*  Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| In re Daniel B. et al., Persons Coming Under the Juvenile Court Law. | B254274 |
| | (Los Angeles County Super. Ct. No. DK00453) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. ANGELA B., Defendant and Appellant. | **ORDER MODIFYING OPINION AND CERTIFYING OPINION FOR PUBLICATION [NO CHANGE IN JUDGMENT]** |

THE COURT:

It is ordered that the opinion filed herein on October 22, 2014, be modified as follows:

1. On page 1, second paragraph the name "Debra" is changed to read "Deborah" so the sentence reads:

   Deborah Dentler, under appointment by the Court of Appeal, for Defendant and Appellant.

There is no change in the judgment.

The opinion in the above-entitled matter filed on October 22, 2014 was not certified for publication in the Official Reports. For good cause it now appears that the opinion meets the standards for publication specified in California Rules of Court, rule

8.1105(c), and appellant's request for publication pursuant to California Rules of Court, rule 8.1120(a) is granted.

IT IS ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion herein be published in the Official Reports.

_____

PERLUSS, P. J.,                    ZELON, J.                    SEGAL, J.[*]

_____

[*] Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.