Filed 3/17/21  In re A.R. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re A.R.,<br><br>a Person Coming Under the Juvenile Court Law. | B306512<br>(Los Angeles County<br> Super. Ct. No. 19CCJP00433B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>      Plaintiff and Respondent,<br><br>      v.<br><br>E.R.,<br><br>      Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Annabelle G. Cortez, Judge.  Affirmed.

Anuradha Khemka, by appointment of the Court of Appeal, for Defendant and Appellant.

Mary C. Wickham, County Counsel, Kim Nemoy, Assistant County Counsel, and Peter Ferrera, Principal Deputy County Counsel, for Plaintiff and Respondent.

E.R. (mother) appeals from a juvenile court's dispositional order removing her four-year-old son, A.R., from her custody. She contends that the juvenile court failed to state its factual finding in support of its determination to remove A.R. from her care, and that the evidence does not support such a determination. (Welf. & Inst. Code, §§ 361, subds. (c)(1), (e).)[1] We conclude that mother forfeited her objection to the lack of express findings, that any error was harmless, and that substantial evidence supports removal. Accordingly, we affirm.

## BACKGROUND

*Prior Dependency Proceedings*

In September 2017, a dependency action was initiated involving then one-year-old A.R. (born Jan. 2016). That proceeding involved allegations of domestic violence against mother by A.R.,'s father (who is not a party to this appeal) in the child's presence. In December 2017, the court issued a three-year restraining order (R.O.) to protect mother and A.R. from father.

Mother received 17 months of family maintenance services, after which DCFS reported that, although she had nearly completed her court-ordered case plan, mother had gained little insight regarding domestic violence. Father had received a five-year prison sentence for the domestic violence and was ineligible for parole before May 2020. At

---

[1] Statutory references are to the Welfare and Institutions Code.

2

the conclusion of the proceeding, mother was given sole legal and physical custody of A.R.

*The Current Dependency Action*

On December 16, 2019, DCFS received a referral alleging that father had beaten mother during an argument in mother's home while A.R. was present. Police officers who responded found mother with black eyes and other visible injuries. She appeared very nervous and slightly intoxicated. Father fled before the officers arrived. Mother said father had been released from prison in November 2019, and had returned to stay with her and A.R. despite the outstanding R.O.

In preparation for the detention hearing, DCFS reported that mother claimed father was "very controlling, demanding and use[d] [A.R.] to get what he want[ed] by making threats to hurt [the child] if mother [did] not allow him in the home. [Father] also threatened to kill mother, [A.R.] and [mother's] family if she did not comply with his demands." DCFS reported that both parents drank alcohol and smoked marijuana around A.R. Despite the R.O., mother acknowledged having contact with father (exchanging texts, receiving calls) and visiting him while he was incarcerated. During his incarceration, father continued to control and threaten mother.

Regarding the December 16, 2019 domestic violence incident, mother told the police that father entered the apartment without permission while she was out and waited for her to come home. After

3

she arrived, he punched her in the stomach and face.  She escaped to the maternal grandmother's (MGM) apartment nearby.

When DCFS interviewed mother on December 16, she acknowledged that her recall of events might be unclear, as she was out drinking and smoking marijuana with friends the night before while A.R. spent the night with his paternal grandmother (PGM).  She said father entered the apartment while she was gone and began beating her when she returned.  Mother acknowledged the outstanding R.O. and denied that father lived with her or that they were still involved in a relationship.  She denied using drugs other than marijuana, and agreed to take a drug test, which was negative.

During a meeting with DCFS later in December, mother admitted having allowed father and A.R.'s paternal grandparents (PGPs) into her home over Christmas.  She acknowledged the R.O. was still in place and she was wrong to have allowed father to visit.  Mother agreed to cooperate with DCFS, to be protective of A.R., and to not permit father to visit A.R. again at her home.

In mid-January 2020, an anonymous caller informed DCFS that mother was still spending time with father and had told the caller she was pregnant with father's child.  The caller said mother spent New Year's Day with father at his home.  On January 17, 2020, DCFS removed A.R. from mother and placed him in protective custody in the care of a maternal aunt.

On January 22, 2020, DCFS filed a section 300 petition on behalf of A.R. alleging the child was at risk of serious physical harm as the

4

result of the parents' violent altercations and histories of substance abuse. The juvenile court ordered A.R. detained from parents' custody and gave parents monitored visitation. The matter was set for an adjudication hearing which, for various reasons, was continued from March to July 2020. In January 2020, father turned himself in to the police to face charges of burglary and domestic violence regarding the December 2019 domestic violence incident.

Meanwhile the current DCFS social worker spoke with a social worker who had worked on the family's 2017 dependency action. That social worker recalled that mother had made questionable decisions, such as visiting father in prison in violation of an active R.O. and giving him money. The previous social worker also said mother denied any domestic violence and declined services for A.R. despite the child's displays of aggression.

In early February 2020, the facilitator for mother's domestic violence group and individual counseling reported to DCFS that mother attended treatment sessions consistently and was remorseful about domestic violence in the family's home. The facilitator opined that mother was protective of A.R. and did not present a safety concern to him.

The maternal aunt told DCFS that A.R. was adjusting to living in her home, but problems remained. A.R. had angry outbursts, and would strike himself and others when he became upset. When family members spoke loudly, he became startled and afraid; he would hide, shake, and try to hug the maternal aunt for comfort. When she set

5

limits for him, he threatened, "I am going to tell my dad to hit you." The aunt also reported that A.R. missed mother and cried when he talked to or saw her.

In mid-February, an assessor from the Multidisciplinary Assessment Team (MAT)[2] met with mother and expressed concern that she was defensive and difficult to work with. The assessor reported that mother minimized father's domestic violence against her and believed A.R. was not at risk because father was in custody. Also, mother had changed jobs, father did not know where she worked, and mother planned to move out of her current apartment. However, the MAT assessor observed that very young children exposed to domestic violence may be at high risk for externalized behavioral problems, tantrums and aggression. The assessor recommended therapy for A.R. because his developmental and emotional status remained vulnerable due to his history of trauma.

DCFS discussed the allegations of the petition with mother on February 20, 2020. Mother told DCFS that PGPs came to her home on Christmas, and she let them take A.R. outside to receive a present from father. She denied violating the R.O., and denied that she had used marijuana or had any problem with alcohol.

As to the December 2019 domestic violence incident, mother said she recalled little. She had been out drinking and smoking marijuana

---

[2] MAT is a collaboration between DCFS and the Department of Mental Health designed to ensure immediate and comprehensive assessment of children entering out-of-home placement.

with friends while A.R. was at the PGM's house (the PGM denied babysitting A.R. at the time of the incident). Father broke into the apartment, they argued, and she remembered being on the floor while he hit her. She escaped to MGM's apartment and called the police. Mother denied seeing father or having had any contact with him since his arrest for this incident, and also denied that father had ever "had access" to A.R.

In early March 2020, the maternal aunt told DCFS that mother used a separate cell phone to stay in contact with father. DCFS reported that mother said she wanted to move somewhere father would not know about and had been referred to an agency for financial help. DCFS advised mother to obtain a new R.O. after the existing order expired. Mother agreed to do so, but did not believe an R.O. would stop father's violence. Mother's domestic violence counselor informed DCFS that mother had been outspoken during group and individual sessions. She believed mother had shown good judgment and had acknowledged her failure to protect A.R.

In March 2020, mother informed DCFS she had closed her inmate visitation account, had moved to a confidential address and had no interest in resuming a romantic relationship with father.

DCFS received a June 30, 2020 letter from the counselor for mother's domestic violence support group. The counselor reported that mother's participation in the group was satisfactory: she had enrolled in treatment in January 2020, and had attended 21 of 26 sessions.

The counselor also reported that mother had been participating in individual counseling sessions "to process traumatic events of her victimization." Her treatment goals were to overcome negative and self-defeating thoughts, and to control her anger and to resolve conflicts without violence. She was continuing to address case issues, including protecting A.R. from additional abuse, and was making "good progress" in treatment and putting into practice concepts she learned in therapy. The counselor said mother appeared to have a better understanding of how to avoid and prevent violence in her family relationships. She had attended 24 individual counseling sessions and missed two.

In its report for the jurisdictional hearing, DCFS expressed concern that mother minimized the extent of the domestic violence between herself and father. DCFS was also troubled by several inconsistencies in mother's account of events in the December 2019 incident. For example, mother had told a DCFS investigator she had not allowed father into her home on Christmas, but told a social worker that both father and the PGP's were there. Mother claimed A.R. was with PGM at the time of December 2019 incident of domestic violence, but PGM denied babysitting the child that night. Mother told DCFS she recalled little about the December 2019 incident, but she gave the police a detailed account. Finally, mother denied smoking marijuana before the incident when she spoke with a DCFS investigator, but admitted having done so to the social worker.

*Jurisdiction / Disposition*

A combined adjudication/disposition hearing was conducted on July 1, 2020. The court admitted the parties' documents in evidence.

Mother's counsel argued that mother should be deemed nonoffending and that A.R. was not at risk of harm given mother's progress in treatment at addressing case-related issues. DCFS, joined by A.R.'s counsel, disagreed.

The juvenile court concluded A.R. remained at current risk of harm. The court referred to the previous dependency proceeding, recent violence between the parents, and "multiple instances . . . where [parents] did not comply with [the R.O.]." It observed that, although mother had "recanted" her admission of having allowed father into her home, other evidence supported a conclusion that she had in fact violated the R.O. Further, the court acknowledged that although mother had made progress in her ability to recognize the severity of father's violence, there also was evidence she had been in denial as to the fact or extent of his domestic violence. In addition, father was not involved in services and remained a risk to A.R. despite the fact that he was currently in custody. The court found this circumstance particularly troubling given the fact that "mother's explanation [wasn't] necessarily consistent with what others indicate[d] regarding [her] contact with the father." The juvenile court sustained count b-1 of the petition and dismissed the remaining allegations.[3]

---

[3] The sustained allegations state: "[Parents] have a history of engaging in violent physical altercations. On 12/16/19 the father struck the mother on the stomach and face multiple times with a close [*sic*] fist resulting in the

9

Proceeding to disposition, mother's counsel pointed out mother's consistent participation and significant progress in treatment for domestic violence. Counsel acknowledged that DCFS preferred to proceed more cautiously, progressing from monitored to unmonitored visits, then overnights. However, mother's counsel argued that approach was unnecessary because A.R. could remain safely in mother's care so long as she continued to participate in services and enforced the R.O. Mother's counsel noted that DCFS could make unannounced visits to mother's home, and informed the court that mother had developed a safety plan with her landlord, who would summon the police if father showed up at mother's home.

Agreeing with arguments made by DCFS and counsel for A.R., including the argument by A.R.'s counsel that the circumstances of the prior dependency action militated in favor of removal of A.R. from mother's care, the court observed that A.R. was at a tender age and risked internalizing negative behaviors due to the domestic violence in the home. The court found DCFS had satisfied its burden, particularly given the multiple "inconsistencies" in mother's statements to DCFS. The court "completely agree[d] with [A.R.]'s counsel in his assessment of

mother sustaining abrasions and pain to [her] face. The mother failed to protect the child by allowing the father to have unlimited access to the child. The child is a prior dependent of the Juvenile Court Services due to the parent's domestic violence. The [parents] violated the restraining order. The father has multiple convictions for" violent crimes, including spousal battery and assault with a deadly weapon. "Such violent conduct on the part of the father against the mother and the mother's failure to protect the child endangers the child's physical health and safety and places the child at risk of serious physical harm, damage, danger and failure to protect."

10

the risk [to A.R.] in this case." The court "adopt[ed] by reference the facts" that both it and DCFS had noted in the adjudication portion of the hearing, as well as those identified by A.R.'s counsel as to disposition, "understanding that the burden that [DCFS] has at disposition is a much higher burden, and . . . finding that [DCFS] has met that burden."

The juvenile court found that, viewed in totality, although mother had progressed in treatment, her progress was not sufficient to mitigate the risks to A.R., such as those identified in the MAT assessment. The court wanted to see evidence mother could act in a protective manner and enforce the R.O. during unmonitored visits. The court understood mother's argument that unmonitored visitation was not required before A.R. was restored to mother's care. However, the court found that a cautious transition plan was "important in this case given the multiple violation[s] of the restraining order." Such a plan would provide DCFS an opportunity closely to monitor mother's contact and to liberalize her visitation to overnights when appropriate, with the aim of eventually obtaining a home of parent order. The court observed that, before A.R. could safely be transitioned to mother's care it was important to see mother consistently engage in protective behavior during visits and remain available to DCFS in order to ensure there were no further issues. The court wanted to provide DCFS an adequate opportunity to assess mother's protectiveness, and to be sure she enforced the R.O. If DCFS was satisfied that unmonitored and eventual overnight visitation

11

went well, the court remained hopeful it would soon be able to transition the matter to a home-of-parent order.

The juvenile court declared A.R. a dependent of the court and removed him from parental custody. Mother was given reunification services and unmonitored visitation.

## DISCUSSION

Mother contends that the juvenile court failed to specify its factual findings in support of its determination that there were no reasonable means to prevent the need to remove A.R. from her care, and that the evidence does not support such a determination. We conclude that mother has forfeited her objection to the lack of factual findings, that in any event any error was harmless, and that substantial evidence supports the removal order.

"A dependent child shall not be taken from the physical custody of his or her parents . . . with whom the child resides at the time the petition was initiated, unless the juvenile court finds clear and convincing evidence . . . [¶] [t]here is or would be a substantial danger to the physical health, safety, protection, or physical or emotional well-being of the minor if the minor were returned home, and there are no reasonable means by which the minor's physical health can be protected without removing the minor from the minor's parent's . . . physical custody." (§ 361, subd. (c)(1).)

However, once it has assumed jurisdiction over a dependent child, "'the court may limit the control to be exercised over the . . . child by

[either] parent.'" (*In re Anthony Q.* (2016) 5 Cal.App.5th 336, 346.) "The parent need not be dangerous and the minor need not have been actually harmed before removal is appropriate. The focus of the statute is on averting harm to the child." (*In re T.V.* (2013) 217 Cal.App.4th 126, 135–136.)

Before removing a child from a parent's care, the juvenile court must determine "whether reasonable efforts were made to prevent or to eliminate the need for removal of the minor from his or her home." (§ 361, subd. (e).) The statute also requires the court to state the facts on which its decision to remove the child is based; failure to do so is error. (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1067.)

However, such error is not reversible per se. If it is not reasonably probable the juvenile court would have reached a different conclusion had it specified the factual bases for its finding, the error is harmless. (See *In re Diamond H.* (2000) 82 Cal.App.4th 1127, 1137, disapproved on another ground by *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 748, fn. 6.) In addition, a well-established rule provides that an appellate court "'ordinarily will not consider a challenge to a ruling if an objection could have been but was not made in the trial court. [Citation.] The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected. [Citation.]' [Citation.]" (*In re Daniel B.* (2014) 231 Cal.App.4th 663, 672.)

Here, Mother maintains the juvenile court failed to state the factual bases for its dispositional finding that no there were no

reasonable means to prevent A.R.'s short of removal from her care. Mother's counsel raised no objection at the dispositional hearing regarding the court's failure to satisfy the requirements of section 361, subdivision (e). Accordingly, mother has forfeited her argument that the court failed to satisfy the statutory requirements.

In any event, to the extent the court erred, the error is harmless because it is not reasonably probable the juvenile court would have reached a different conclusion had it specified the factual bases for its finding. (*In re Diamond H.*, *supra,* 82 Cal.App.4th at p. 1137.) The record reflects that the juvenile court did consider—and rejected— whether means existed to permit A.R. to remain safely in mother's care.[4] The court acknowledged that it could release A.R. to mother's care without taking the preliminary steps of providing her unmonitored visitation. But the court rejected that approach. It explained at length why under the circumstances it concluded it was prudent to proceed incrementally and with caution.

To the extent the court erred by incorporating by reference the arguments of counsel, any error was harmless. For example, A.R.'s counsel argued that mother's conduct in the prior dependency action two years earlier militated in favor of adopting a more cautious approach here. The juvenile court expressly agreed with this argument, and it is obvious why. In the prior dependency action, mother was the

---

[4]     The standard-form minute order indicates the court made an explicit finding that there were no reasonable means to protect A.R. short of removal from mother's care. The reporter's transcript does not contain an equivalently specific finding.

victim of domestic violence so severe that father was sentenced to five years in prison. That violence occurred in A.R.'s presence. Mother obtained an R.O. and took part in a program aimed at educating victims of domestic violence. However, despite her participation in that program, mother maintained contact with father in violation of the R.O.

The cycle of domestic violence began again in December 2019 in A.R.'s presence after father was released from prison. Once again mother took part in domestic violence counseling. And once again there was evidence she continued to spend time with father, permitted him into her home while A.R. was there, and lied about it. The court observed that four-year-old A.R. had displayed fear and aggression in ways common to children exposed to the trauma of domestic violence. Given this history, along the legitimate questions regarding mother's veracity and the degree to which she was committed to moving beyond her violent relationship with father, the court reasonably concluded that it was wise to proceed more slowly with unmonitored and eventual overnight visits. Doing so would give DCFS an adequate opportunity to monitor developments, and to ensure that mother enforced the R.O., visited A.R. alone, and behaved "protective[ly]." To the extent the juvenile court might have erred in not specifying certain factual findings, that error was harmless. It is not reasonably probable mother would have received a more favorable result had the court more explicitly complied with section 361, subdivision (e). (See *In re Cristian I.* (2014) 224 Cal.App.4th 1088, 1098–1099 [before a judgment may be reversed for ordinary error, it must appear the error about which

15

appellant complains has resulted in a miscarriage of justice and that, upon examination of the record, it is reasonably probable that the court would have reached a result more favorable to appellant in the absence of error].)

For similar reasons, we also reject mother's contention that the evidence is insufficient to support removal, and that an order releasing A.R. to her care and requiring DCFS to make unannounced visits would suffice to ensure her progress and A.R.'s safety in her care. Of course, evidentiary conflicts are resolved in favor of the lower court's order and, where possible, legitimate inferences are indulged to uphold the decision. We do not reweigh or express an independent judgment on the evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Random visits by DCFS would be of limited utility. They would not permit DCFS to assess the family's situation at any time except during the visit. Nor would mother's proposed "safety plan" with her landlord suffice. There was certainly no guarantee that the landlord could prevent father from breaking into mother's home while A.R. was present, or from waiting outside for her to return with A.R. Moreover, given that mother had failed to enforce the R.O. in the past, there was reason to believe that she would not do so in the future. Further, as mother conceded to DCFS, she did not believe father's violence would stop even if she renewed the R.O.

On the other hand, providing mother with unmonitored visitation during which her progress, her compliance with the R.O., and her

16

ability to protect Aiden could be monitored by DCFS, was a reasonable course of action.  Substantial evidence supports the disposition order.

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.

We concur:



MANELLA, P. J.



COLLINS, J.