Filed 7/21/21  In re Christopher F. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

|  |  |
|---|---|
| In re CHRISTOPHER F. et al., Persons Coming Under the Juvenile Court Law. | B309522 (Los Angeles County Super. Ct. No. 20CCJP01776A-B) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. TIFFANEE F., Defendant and Appellant. | |

APPEAL from orders of the Superior Court of Los Angeles County, Kristen Byrdsong, Juvenile Court Referee.  Affirmed.

Anuradha Khemka, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Jessica S. Mitchell, Deputy County Counsel, for Plaintiff and Respondent.

\* \* \* \* \* \*

Tiffanee F. (mother) appeals from custody and dispositional orders of the juvenile court concerning her two children, Christopher F. (born January 2016) and Nicholas F. (born February 2020). The two children have different fathers.[1]

As to Nicholas, the juvenile court terminated jurisdiction and placed him with father permitting mother monitored visits. On appeal mother challenges the custody order, arguing that it is too vague to provide her with an opportunity to seek modification in the future. Mother further challenges the court's order that mother's visits be monitored by a mutually agreed upon person or a professional monitor paid for by mother.

As to Christopher, the juvenile court removed him from mother and ordered reunification services, including a comprehensive psychological evaluation for the purpose of diagnosis and medication assessment. Mother argues that this order was an abuse of discretion due to its undue burden on her as she is already a client of the regional center and is engaged in ongoing services.[2]

---

[1] Christopher's father is unknown. Nicholas's father is Hector A. (father). Father is not a party to this appeal.

[2] The regional center is a private nonprofit community-based organization which contracts with the State Department of Developmental Services to coordinate services for individuals with developmental disabilities. (*Morohoshi v. Pacific Home*

2

Finding no reversible error, we affirm the orders of the juvenile court.

## COMBINED FACTUAL AND PROCEDURAL HISTORY
**Mother's prior child welfare history**

At the time of Christopher's January 2016 birth, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging that mother was unable to understand basic information and unable to care for her child without assistance. Mother was not able to feed, burp, or change Christopher's diapers without constant assistance from hospital nurses. The regional center was contacted, and services were initiated for mother. The referral was closed as unfounded.

Two months later DCFS received a referral alleging that mother neglected Christopher. The reporting party stated that mother was unable to care for her newborn and no services had been arranged. The baby had been heard crying nonstop while mother was observed sitting on her bed looking at the wall. Mother had also been seen talking to herself and attempting to force a bottle into Christopher's mouth. Services for mother had commenced and were terminated due to mother's need for a greater level of attention and one-on-one teaching. The allegation of neglect was substantiated. Mother agreed to voluntary family maintenance.

(2004) 34 Cal.4th 484, 486; *Arce v. Kaiser Foundation Health Plan, Inc.* (2010) 181 Cal.App.4th 471, 479, fn. 3.)

**Investigation, petition and detention in the current matter**

On February 5, 2020, DCFS received a report that Christopher had little food, clothing or diapers; the home was unkempt; infested with roaches; and had plumbing problems that mother had not reported to the landlord. During the investigation mother had to be hospitalized because she went into early labor. Christopher was placed in out-of-home foster care as there was no one else to care for him. Mother agreed to the temporary placement under a voluntary family reunification plan. After mother was released from the hospital, Christopher was returned to mother's care.

Nicholas was born prematurely in February 2020 with a low birth weight of five pounds four ounces. At his first well child appointment Nicholas's weight had dropped to five pounds.

On February 28, 2020, DCFS received a report that Nicholas had a foul smell and was not responding as a normal baby. He appeared lifeless. Mother had not followed up with the child's primary doctor. Mother appeared paranoid, easily distracted, and without concern for the child's well-being.

The social worker who was working with the family became aware of several incidents in which four-year-old Christopher physically harmed newborn Nicholas. Christopher was observed scratching the newborn's face, poking him in the eye and throwing mud at his face which then got into the baby's mouth. In addition, Christopher had turned on the stovetop and started a fire. Mother appeared to be unable to protect Nicholas or control Christopher's behavior. In March 2020, mother voluntarily gave written consent for Christopher to be removed from her custody.

4

He was then detained from mother in foster care. Nicholas remained in mother's custody.

On March 27, 2020, DCFS filed a petition on behalf of Christopher and Nicholas pursuant to Welfare and Institutions Code section 300, subdivision (b),[3] alleging that mother had a diagnosis of mild intellectual disability, which limited mother's ability to provide appropriate care and supervision for the children.

On April 1, 2020, the juvenile court made detention findings and ordered Christopher detained from mother. Nicholas remained released to mother. The court ordered monitored visitation for mother with Christopher and a multidisciplinary assessment of the children and family.

**May 2020 jurisdiction/disposition report**

During an interview on May 1, 2020, mother stated that her goal was to have Christopher in foster care temporarily so that he could get therapy. She was afraid that Christopher's behavior would "get out of hand," and he would hurt the baby. Mother identified her needs as finding a larger place to live, having services for Christopher, and taking parenting classes to learn how to control his behavior. Mother agreed that individual counseling would help her control her anxiety. Mother signed forms allowing DCFS to refer her to family preservation services. Mother was not employed but received social security benefits due to her diagnosis of mild intellectual disability. She also received food stamps and "WIC" benefits for Nicholas.

---

[3] All further statutory references are to the Welfare and Institutions Code.

5

Mother denied any symptoms related to psychosis and denied current depression or suicidal ideation. She admitted, however, that due to anxiety it had been previously recommended that she see a psychiatrist. Mother reported that she was receiving services from Harbor Regional Center due to an unspecified learning disorder.

Someone in her attorney's office advised mother to call Christopher's caregiver Monday through Friday to speak to Christopher. Mother's cell phone was not set up for FaceTime, but the social worker explained how to download it on her phone.

On May 4, 2020, Christopher's caregiver reported that mother had both her phone numbers, however, mother had not called since the child was placed with her on March 27, 2020.

Mother's home care provider, Ms. C., was also interviewed. She had been working with mother at mother's home since Christopher was one year old, three to five times each week for two hours per visit. She also spoke daily with mother by telephone and "discussed what [mother] needs to do in terms of basic care for herself and with the children." Ms. C. disclosed that Christopher had behavioral problems, including hitting and kicking, and had expressed anger towards Nicholas. Ms. C. was of the opinion that mother was not able to handle Christopher even before the baby was born. Ms. C. explained that mother did not have good coping skills and reacted poorly when stressed. Ms. C. reported that mother is not able to retain information for very long, and instructions must be repeated over and over. Ms. C. stated that she had to show mother at least six times how to put the baby's diaper on correctly. Ms. C. believed Christopher was "where he needs to be." Ms. C. denied having any concerns regarding Nicholas's safety in mother's care, though she believed

that mother needed individual counseling and parenting classes. Ms. C. had previously recommended that mother take a parenting program through the regional center, but mother refused.

DCFS expressed concern with mother's intellectual delays and possible mental health issues. Mother had disclosed a history of sexual and verbal abuse by her adoptive parents and admitted to experiencing anxiety. Mother had a previous diagnosis of avoidant personality disorder and had never participated in individual counseling to address her anxiety. DCFS also expressed concern with mother's lack of parental affection towards her children and her previous refusal to participate in parenting classes. Therefore, DCFS requested that mother undergo a comprehensive psychological assessment.

DCFS recommended that the juvenile court sustain the petition, declare the children dependents of the court, order family reunification for mother and Christopher and family maintenance for mother and Nicholas. DCFS recommended that mother be ordered to undergo a comprehensive psychological assessment. DCFS further recommended that Christopher remain out of the home until Christopher could receive mental health services and mother completed individual counseling, age appropriate parenting, and found a larger residence.

**Reports filed September through November 2020**

DCFS reported that father called the social worker at mother's direction. Father believed he might be Nicholas's father, but he requested a paternity test. He was willing to support the child if he was the child's father. Father resided with his girlfriend and their three-year-old daughter, was employed, and had recently purchased a new home. On September 2, 2020,

the juvenile court appointed counsel for father, found him to be Nicholas's alleged father and ordered a DNA test.

DCFS reported in October that mother was participating in weekly therapy sessions and parenting classes. DCFS received father's DNA results, reflecting a 99.99 percent probability that father was Nicholas's biological father. A social worker went to father's five-bedroom, three-and-a-half-bathroom home where father lived with his girlfriend and their child. The home was spacious, organized, and clean with plenty of food. Father owned a computer technician business and had a flexible work schedule.

Father reported that he met mother, who was wearing provocative clothing, on the street. They had sexual intercourse for money on six occasions. During the time that father and mother were having sex, Christopher was left unsupervised. Father stated that Ms. C. was aware that mother had sex with men for money. Father expressed concern about mother's ability to care for Nicholas as well as mother continuing to work as a prostitute. Father wanted full custody of Nicholas.

A monitored visit between father and Nicholas was scheduled for November 2, 2020. During the visit the child slept in father's arms. Father stated that he was ready to take custody of the child and would ensure that the child had everything he needed. When mother and Ms. C. came to collect Nicholas, father provided mother with diapers, baby wipes, and baby food.

Fernando, who resided in the same apartment complex as mother, reported that he had seen mother with Nicholas late at night "prostituting herself." Fernando also once observed mother leave Christopher alone in the alley unsupervised late at night. Ms. C. acknowledged that she was aware that mother had sex for money with father and one other male. Ms. C. had also heard

from various neighbors that mother engaged in sex for money. Ms. C. expressed concern for Nicholas as mother could bring the wrong men into the home and something could happen to Nicholas. Ms. C. was glad that mother was participating in parenting classes and individual therapy; however, mother had not changed her lifestyle.

On November 3, 2020, DCFS detained Nicholas from mother and released him to father.

**Section 385 petition**

On November 10, 2020, DCFS filed a section 385 petition requesting that the juvenile court detain Nicholas from mother and release him to father. Mother denied having sex with men for money or leaving Christopher or Nicholas unsupervised in order to have sex. Mother reported that she and father had been in a relationship.

At the section 385 hearing on November 10, 2020, the court detained Nicholas from mother and ordered him to remain released to father with monitored visits to mother.

**December 1, 2020 supplemental report**

Christopher remained in foster care and Nicholas remained in the home of father. Father reported that he did not know that mother left Nicholas alone in the home until a neighbor notified him. The neighbor told father that the residents at the apartment complex could hear Nicholas crying the entire time mother was gone from her apartment.

When the social worker visited father's home, Nicholas appeared to be developing appropriately. Father indicated that the child was happy, and his daughter was "ecstatic" about having Nicholas in her life.

Mother was asked whether she understood the reasons that Nicholas was detained from her. She responded, "[T]here were rumors about me prostituting but I don't do that." Mother blamed father for making up this rumor. Mother stated that father went to her apartment between June and September 2020 even though the juvenile court had ordered him to stay away. The dependency investigator informed mother that there was no stay-away order in place. When the dependency investigator began asking mother additional questions about how she met father, mother stated that she was not feeling well and ended the call. Mother completed a 20-week parenting program in October 2020.

The social worker attempted to set up a visitation schedule for mother to visit with Nicholas. However, father insisted that mother meet him halfway between their homes.[4] When the social worker offered to pick up Nicholas, take him to visit mother, then return him to father, father refused the offer. The social worker indicated that father was being oppositional. The social worker offered to provide mother with a bus pass to visit Nicholas, but mother claimed she could only visit after she was paid in December.

DCFS recommended that the juvenile court sustain the petition, declare Christopher and Nicholas dependents of the court, order Christopher suitably placed and order Nicholas to remain with father with a juvenile custody order granting father full legal and physical custody with termination of jurisdiction over Nicholas and monitored visitation for mother. DCFS

---

[4] Father lives in Victorville, California and mother resides in Wilmington, California.

recommended family reunification services for mother and Christopher, with mother to participate in a comprehensive psychological evaluation for the purpose of diagnosis and to assess the need for medication; continued individual counseling; and continued parenting education.

**Jurisdiction/disposition hearing**

The juvenile court held a combined jurisdiction and disposition hearing on December 1, 2020. Mother argued that Christopher and Nicholas should be returned to her custody. Alternatively, mother argued that her visits should be unmonitored.[5] Mother argued that her case plan should consist only of individual counseling because mother was already enrolled in a substantial number of programs. Christopher's counsel concurred with the DCFS recommendation to remove Christopher from mother. Nicholas's counsel concurred with the DCFS recommendation to remove Nicholas from mother and place him with father.

The juvenile court sustained the section 300 petition under subdivision (b)(1) as alleged. The court declared the children dependents of the court and found by clear and convincing evidence that the children's physical health, safety, protection and physical and emotional well-being were at substantial risk if they were to remain with mother.

As to Nicholas, the court granted father sole physical and joint legal custody and terminated jurisdiction upon receipt of a

---

[5]     Specifically, mother's counsel stated: "[M]other objects to terminating jurisdiction to any unmonitored visitation order . . . ." We assume mother's counsel meant to object to termination of jurisdiction with a monitored visitation order, and accidentally misspoke.

juvenile custody order.[6]  Father's counsel agreed to prepare the joint custody order and requested that mother's visits be monitored by a mutually agreed-upon monitor.

The juvenile court stayed its order terminating jurisdiction over Nicholas until receipt of the custody order.  The court ordered "mother's visits to be monitored by a mutually agreed upon monitor or a professional monitor paid for by mother at the rate of two by two."

On December 10, 2020, the juvenile court signed a written juvenile custody order awarding father sole physical and joint legal custody of Nicholas.  Mother was granted monitored visitation a minimum of twice per week for two hours, with a mutually agreed upon monitor or, "[i]f mother and father are unable to agree to monitor, a professional monitor shall be funded for by the mother."  The attached form JV-205 indicated supervised visitation was to continue until further order of the court.  Additionally, an attachment to form JV-206 indicated that mother was to have only supervised visitation.  The boxes next to the reasons for mother's supervised visitation were left blank, however the boxes indicating a need for parenting classes and individual counseling were marked with an "x."

As to Christopher, the court ordered reunification services. Mother was to participate in a case plan including: (1) a developmentally appropriate parenting course; (2) a psychological assessment, specifically to complete a comprehensive psychological evaluation for the purpose of diagnosis and

---

[6]     The juvenile court initially ordered sole legal custody to father but changed the order to joint legal custody as requested by Nicholas's counsel.

medication assessment; and (3) individual counseling to address case issues.

On December 2, 2020, mother filed a notice of appeal from the juvenile court's orders.

## DISCUSSION

### I. Applicable law and standards of review

At the close of a dependency case the juvenile court may enter a final custody order determining final custody of and visitation with a child, as it did for Nicholas in this matter. (§ 362.4, subd. (a).) The final custody order may be the basis for opening a family law case. (*In re Cole Y.* (2015) 233 Cal.App.4th 1444, 1455.) Generally, we review a juvenile court's decision to terminate jurisdiction and enter a final custody order for abuse of discretion. (*In re C.M.* (2019) 38 Cal.App.5th 101, 104.) For procedural errors, the harmless error analysis is applicable. (*In re Celine R.* (2003) 31 Cal.4th 45, 60.)

The juvenile court's dispositional orders, requiring that mother have monitored visits and that she undergo a comprehensive psychological evaluation, are reviewed for abuse of discretion. (*In re K.T.* (2020) 49 Cal.App.5th 20, 25.)

### II. Juvenile custody order

The juvenile court terminated jurisdiction as to Nicholas with a juvenile custody order issued pursuant to section 362.4, subdivision (a). Mother challenges the custody order on two grounds. First, she argues that the order did not provide sufficient specificity as to the reasons that mother's visitation with Nicholas must be monitored. Mother argues that such vagueness deprives the family law court of a nonconfidential explanation for the juvenile court's supervised visits order and

13

therefore prevents mother from showing changed circumstances for the purpose of modifying the order. Secondly, mother argues that the juvenile court abused its discretion in ordering that mother's visits be monitored by a mutually agreed-upon monitor or a professional monitor paid for by mother. Mother argues that the juvenile court exceeded the limits of its legal discretion by rendering an illusory visitation order, as father was noncooperative and mother does not have the means to pay for a professional monitor.

We address these issues separately below. We conclude that the juvenile custody order was sufficiently specific and that mother forfeited the factual issue concerning selection of, and potential compensation for, a monitor. We therefore affirm the orders.

### A. *Applicable law*

"When a juvenile court terminates its jurisdiction over a dependent child, it is empowered to make 'exit orders' regarding custody and visitation. [Citations.] Such orders become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court." (*In re T.H.* (2010) 190 Cal.App.4th 1119, 1122-1123.) Section 362.4 authorizes the juvenile court to make such an order. (*In re Anna T.* (2020) 55 Cal.App.5th 870, 871 (*Anna T.*).)

A custody order issued by the juvenile court pursuant to section 362.4 is a final judgment and cannot be modified in a family law proceeding unless the court finds that there has been a significant change of circumstances since the juvenile court issued the order and modification of the order would be in the

14

child's best interests.  (§ 302, subd. (d); *Anna T., supra,* 55 Cal.App.5th at p. 871.)

California Rules of Court, rule 5.700(b) mandates the use of Judicial Counsel form JV-200 (Custody Order—Juvenile—Final Judgment).  The importance of using the mandatory form was explained in the August 18, 2015 report by the Judicial Council's Family and Juvenile Law Advisory Committee, which stated: "'The orders need to provide specific direction to the parents and other parties to facilitate compliance and reduce the potential for conflict . . . .  [¶]  Juvenile final custody orders also need to provide sufficient detail, and use language familiar to the family law bench and bar, to permit the family court to enforce them if a dispute does arise or to modify or terminate the orders if circumstances change significantly and modification would be in the best interest of the child.'"  (*Anna T., supra*, 55 Cal.App.5th at p. 878.)  The custody order "'must address the circumstances that led to the juvenile court's child custody and parenting time orders to enable a family court to determine whether circumstances have changed to a degree that justifies considering whether the requested modification is in the best interests of the child.'"  (*Id.* at p. 879.)  This must be done "'without disclosing juvenile case information that should remain confidential, because juvenile court child custody orders, including attachments, are not themselves confidential.'"  (*Ibid.*)

**B.    *Lack of specificity***

The JV-200 form issued in this case refers to the JV-205 form (Visitation (Parenting Time) Order—Juvenile) to delineate mother's visits with Nicholas.  The JV-205 form refers to the attached JV-206 form (Reasons for No or Supervised Visitation). The JV-206 form shows no indication for the reasons for mother's

15

supervised visitation with the exception of one box checked for parenting classes and another box checked for individual counseling.  Mother argues that there is no specificity as to whether the supervised visitation order is due to mother not completing those programs, not making substantial progress, or some other reason.  Mother argues that she is entitled to more specificity so that the family law court can determine whether circumstances have sufficiently changed to justify modification of the order.  Further, because mother is diagnosed with a mild intellectual disability, mother argues that she is entitled to more specific direction for compliance in order to seek a change of the visitation orders.

Mother cites no authority suggesting that the juvenile court's written indication that mother needs parenting and individual counseling provides insufficient guidance for the family law court.  The juvenile court was required to balance mother's privacy with its obligation to explain its order.  By including the services ordered under mother's case plan, the juvenile court has provided the family law court sufficient information to make a determination as to whether circumstances have significantly changed.  The written order suggests that if, in the future, mother completes or makes substantial progress in these programs, she may seek modification of the supervised visitation order.  Further, with the two boxes checked, mother has sufficient guidance as to what she must do in order to seek a change of the visitation orders in the family law court.

*Anna T., supra*, 55 Cal.App.5th 870 is distinguishable.  In *Anna T.,* the juvenile court declined to issue an exit order, finding such an order unnecessary.  The court indicated instead that it

16

was "'reverting to the original family law order,'" with a few changes. (*Id.* at p. 874.) Such changes were "'the things that [the court] stated on the record that will go into the minute order.'" (*Id.* at p. 874-875.) The order terminating jurisdiction over the child restated the court's decision not to issue a juvenile court custody order pursuant to section 362.4, stating: "'The Court reverts back to the original family law decision—no Juvenile Custody Order is required for this case.'" (*Anna T.*, at p. 875.) The *Anna T.* court reversed, finding that the juvenile court's failure to follow required procedures for issuing posttermination custody orders deprived its orders of continuing effect. (*Id.* at p. 879.)

The order in this matter was issued in accordance with the required procedures for post-termination custody orders. The juvenile court's indication that mother is in need of parenting and individual counseling provides sufficient grounds for its order requiring supervised visitation. Mother may request modification from the family court when she has made sufficient progress in those programs.

## C.  *Monitor mutually agreed upon or paid for by mother*

Mother next argues that the juvenile court abused its discretion when it ordered mother's visits to be monitored by a mutually agreed-upon monitor or, if the parents are unable to agree on a monitor, by a professional monitor paid for by mother.

Mother acknowledges that she failed to object to the specific terms of the court-ordered visitation below. Mother did make a general objection to the termination of jurisdiction over Nicholas with monitored visitation. However, after the juvenile court stated on the record that mother was to have monitored

17

visitation "to be monitored by a mutually agreed upon monitor or a professional monitor paid for by mother at the rate of two by two," mother's counsel did not raise any objections to these terms.

We ordinarily do not consider challenges to rulings if an objection could have been made, but was not made, in the trial court. (*In re Daniel B.* (2014) 231 Cal.App.4th 663, 672.) "'The purpose of this rule is to encourage parties to bring errors to the attention of the trial court, so that they may be corrected.'" (*Ibid.*) The forfeiture doctrine is applicable in dependency proceedings. (*In re G.C.* (2013) 216 Cal.App.4th 1391, 1398.)

Mother points out that we have the discretion to review pure issues of law even if they are forfeited due to a failure of the party to object at the trial level. (*Rosa S. v. Superior Court* (2002) 100 Cal.App.4th 1181, 1188.) Mother argues that she has presented such a pure question of law here. She contends that the issue boils down to the question of whether the visitation order effectuates the juvenile court's intention to grant mother visitation, given father's uncooperative attitude and mother's inability to pay a monitor. Mother argues that neither alternative—the parents agreeing, or the mother paying— ensures that mother will have visitation, although the juvenile court clearly intended that mother should have visitation with Nicholas after termination of the juvenile court's jurisdiction.

We disagree with mother's characterization of this issue as a pure question of law. The issue concerning the selection of a monitor for a parent's visits, and the potential payment of a professional monitor, is highly factual and dependent upon many variables in each individual case. In this case, the juvenile court provided two options for mother to help ensure that her visits would take place. Mother did not provide the trial court with any

18

alternative suggestions for a preferable order, nor does she note any reasonable alternatives in her briefing to this court. The appropriate place to make suggestions for possible monitors, and arrangements for visits, is at the juvenile court level. In the absence of an objection—which would have led to a discussion in the juvenile court as to better ways of ensuring visitation—we have no basis to decide that the juvenile court abused its discretion in coming up with this reasonable visitation plan. Nor has mother presented a pure question of law for this court to review. Under the circumstances, mother has forfeited this issue.

We note that mother has recourse to seek modifications to the custody order in family court.

## III. Dispositional order

At disposition, mother requested that her case plan be limited to participation in individual counseling because she was already engaged in a substantial number of programs. The juvenile court nevertheless ordered that mother participate in parenting classes, individual counseling, and a comprehensive psychological evaluation for the purpose of diagnosis and medication assessment. Mother argues that the order requiring a comprehensive psychological evaluation was overly burdensome, arbitrary, and exceeded the bounds of reason, pointing out that she has been a client of the regional center with a diagnosis of mild intellectual disability since 2016 and has willingly participated in programs through the center. Mother further argues that none of the professionals at the regional center has suggested that further evaluation or diagnosis of mother was warranted. Thus, mother argues, the court's dispositional order had no factual basis in the record and was an abuse of the court's discretion.

Section 362, subdivision (a) authorizes the juvenile court to make "all reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child." Under this statute, the juvenile court "has broad discretion to determine what would best serve and protect the child's interests and to fashion a dispositional order accordingly." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 474.) In making dispositional orders, "[j]uvenile courts should be mindful of the burdens their disposition orders impose on parents already grappling with difficult conditions and circumstances." (*In re D.P.* (2020) 44 Cal.App.5th 1058, 1071.) However, the court's paramount concern should always be the child's best interests. (*Ibid.*) On appeal, dispositional orders cannot be reversed absent a clear abuse of discretion. (*In re Baby Boy H., supra*, at p. 474.)

Evidence in the record supported the juvenile court's order that mother undergo a comprehensive psychological analysis. In its jurisdiction/ disposition report of May 20, 2020, DCFS noted that mother may have undiagnosed mental health issues. Mother had previously disclosed to DCFS that she had been a victim of sexual and verbal abuse by her adoptive parents. In addition, mother had been diagnosed with avoidant personality disorder in 2016. Mother never participated in counseling to address her anxiety. DCFS observed a lack of parental affection towards her children, which may have been symptomatic of an underlying health concern.

In addition, there was evidence that mother may have been in denial of reality. Despite evidence from more than one source that mother was a prostitute, mother claimed that those were false rumors that father made up. However, when the social worker pressed mother on how she met father, mother stated she

20

was not feeling well and ended the call.  In addition, mother insisted that the juvenile court had ordered father to stay away, when in fact there was no stay-away order in place.

This evidence supports the juvenile court's decision that a comprehensive psychological evaluation for mother would be in the best interests of her children.  No abuse of discretion occurred.

## DISPOSITION

The orders are affirmed.

_____

CHAVEZ, J.

We concur:


_____

ASHMANN-GERST, Acting P. J.


_____

HOFFSTADT, J.

21