Filed 7/27/21  In re M.C. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re M.C., a Person Coming Under the Juvenile Court Law. | B308304 (Los Angeles County Super. Ct. No. 20CCJP04228A) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, <br><br> Plaintiff and Appellant, <br><br> v. <br><br> C.J., <br><br> Defendant and Appellant. | |

APPEALS from findings and orders of the Superior Court of Los Angeles County, Marguerite D. Downing, Judge.  Affirmed.

Patricia K. Saucier, under appointment by the Court of Appeal, for Defendant and Appellant.

Rodrigo A. Castro-Silva, County Counsel, Kim Nemoy, Assistant County Counsel, and Navid Nakhjavani, Principal Deputy County Counsel, for Plaintiff and Appellant.

_____

On October 14, 2020, the juvenile court sustained a juvenile dependency petition under Welfare and Institutions Code section 300;[1] declared M.C. (minor, born 2009) a dependent of the court; and removed minor from the custody of his mother, defendant and appellant C.J. (mother).  The court declined the request of plaintiff and appellant Los Angeles County Department of Children and Family Services (DCFS) to terminate the court's jurisdiction and, instead, ordered reunification services for mother.

On appeal, mother contends that substantial evidence did not support the jurisdictional findings or the removal order.  In its cross-appeal, DCFS argues that the juvenile court erred by retaining jurisdiction.

We affirm.

_____

[1]     All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

# BACKGROUND

## I. *The Family*

Mother and G.C. (father) are minor's parents.[2] Mother and father separated when mother was pregnant with minor. At the outset of these dependency proceedings, mother had sole physical custody of minor and shared legal custody with father. Father had visitation with minor every other weekend.

## II. *Referral*

On July 15, 2020, DCFS received a referral alleging that, over the past year, mother had been hearing voices telling her to do bad things. Mother was in the beginning stages of psychosis, but she refused to take her medication or follow up with her psychiatrist.

## III. *Initial Investigation*

### A. Interviews with mother

In response to the referral, a DCFS social worker made an unannounced visit to mother's home in mid-July 2020. No safety threats were observed, and there appeared to be plenty of food.

Mother reported that minor had a mild intellectual disability and was receiving services from the regional center. She explained that she would ask a lot of questions of minor after he returned from visiting father because she wanted to ensure that he was not brainwashed.

Three years earlier, mother had started to hear voices caused by someone putting a "'spell'" on her after she got a "'spiritual cleansing[.]'" The frequency of the voices had progressed over time and had been more constant and persistent over the past year. The voices told mother to do "'bad things'" and that she was going to die. Mother denied that she would

---

[2] Father is not a party to this appeal.

3

follow the voices telling her to kill herself. She also denied that the voices ever told her to hurt minor.

Mother claimed that the voices had stopped about a month and a half before, after mother "distanced herself from negative people and maternal relatives."

Mother reported that she had voluntarily admitted herself for psychiatric holds two times since December 2019. On both occasions, she had been discharged after one day because "she did not have anything . . . ." During the first hospitalization, the psychiatrist recommended counseling, but mother did not follow through because it was voluntary, she did not need it, and she learned not to listen to the voices. Mother was prescribed medication but only took it for a week because of the side effects. During the second hospitalization, mother was diagnosed with psychosis.

When she was interviewed a second time at the end of July 2020, mother stated that she wanted her primary doctor to inform DCFS that she could not take psychotropic medication or obtain any form of mental health services unless approved by the doctor.

B. Interview with minor

Minor was also interviewed during the home visit in mid-July 2020. The social worker did not observe visible marks or bruises on minor, who appeared healthy.

Minor reported having a good relationship with both mother and father but stated that he was closer to mother. He did not have permission to visit his maternal relatives, and mother did not want him to talk to his aunts.

When asked if mother ever interrogated him to the point that he was uncomfortable, minor replied, "'well, when I go to my

4

dad's house and I come home she does ask a lot of questions. It's because she wants me to be safe when I go with my dad and wants me to be okay. . . ."' Minor did not like it when father said bad things about mother.

Minor had heard mother and his maternal aunts talking about mother hearing voices. Minor denied that mother would ever try to hurt herself and denied that mother had ever hurt him.

Throughout the interview, minor "expressed being worried about mother because of how other people treat her and appeared protective of mother." Minor stated, "'I love my mom and I don't want anyone to hurt her[.]'"

C. Interviews with other family members

The social worker interviewed various family members, including father, maternal aunts, and grandparents. These interviews disclosed that mother heard voices telling her to hurt herself and others. Mother also suffered from paranoia and panic attacks. Despite numerous hospitalizations and a psychosis diagnosis, mother refused to get treatment for her mental illness. Mother had recently cut off all contact between minor and his maternal relatives.

According to a maternal aunt, mother had paid a "'curandero-spiritual guide'" to perform witchcraft on father. The bad things mother wished upon father did not happen, so mother tried unsuccessfully to get a refund. The man refused and mother believed that he had put a spell on her, causing her to hear voices. Another maternal aunt reported that mother's behavior and panic attacks caused minor to suffer nervous breakdowns. On one occasion, minor "started to cry and sat on the floor in [a] fetal position rocking back and forth."

Father believed that mother did not want him to be alive. Three or four years earlier, mother had shown father a gun that she had recently purchased. According to father, minor had been acting differently lately. When father asked him how things were at home, minor would shut down and cry. Minor had stopped sharing anything about mother's behavior at home, whereas he had previously talked openly about it.

Minor's paternal grandmother stated that the last time she saw minor—about three weeks earlier—he had been acting weird and did not seem to be himself. He appeared quiet and distant. Minor had not been able to sleep and asked the paternal grandmother to hold his hand and hug him so that he could go to sleep. This was not his normal behavior.

IV. *Removal Order*

On August 7, 2020, DCFS sought and was granted an order authorizing the removal of minor from mother's custody. When the social worker tried to serve mother the order, mother became upset and started to scream. The order was eventually served with the assistance of law enforcement.

After minor was placed in father's custody, mother called the child protection hotline two times and the police department once, requesting welfare checks on her son.

V. *Dependency Petition*

On August 12, 2020, DCFS filed a dependency petition seeking the juvenile court's exercise of jurisdiction over minor. Brought pursuant to section 300, subdivision (b)(1) (failure to protect), the petition alleged that mother had a history of mental and emotional problems, which rendered her incapable of providing regular care for minor. Mother failed to take her psychotropic medication as prescribed. Father failed to protect

6

minor from mother. Mother's mental and emotional condition and father's failure to protect endangered minor's physical health and safety and placed him at risk of serious physical harm.

VI. *Detention Hearing*

At the detention hearing on August 17, 2020, the juvenile court found that a prima facie showing had been made that minor was a person described by section 300. Finding that a substantial danger to minor's physical and emotional well-being existed absent removal from mother, the court removed minor from mother and released him to father under DCFS supervision. Mother was granted monitored visitation.

VII. *Jurisdiction/Disposition Report*

A. <u>Additional interviews</u>

The jurisdiction/disposition report detailed additional interviews conducted by a DCFS dependency investigator in September 2020.

When mother was reinterviewed, she denied that she was paranoid, had panic attacks, had suicidal or homicidal thoughts, or heard voices. She explained that she had stopped taking the prescribed medication because of side effects. Although a doctor had told her that she might have psychosis and that further evaluation was needed, mother decided to care for herself and did not believe that she needed prescription medication.

Minor reported that mother would use profanity and shout at herself, which scared him. He stated: "'My mom thought the *curandero* (healer) was controlling her and I am sure that is why she gets mad. She breaks things when she's mad. . . . She puts garlic on her forehead. I tell her it's disgusting and I tell her it's only for when she cooks. She said the garlic would help keep that guy away (healer). . . .'"

Minor continued, "'She screams, makes weird voices and she yells "Stop it, get out of my head!" I would stop her, tell her to calm down, I would tell her to relax, I would give her water, snacks to calm her down. I told my mom, don't do that, you're smarter than that! But she said, "Remember that guy?" and I told her yes mom but he is not controlling you!'"

Minor felt safe in father's home and wanted to stay there.

Father claimed that he had only recently learned about mother's mental health issues. When father would ask minor how things were going, minor would say that mother did not let him talk about things. Minor would start breathing very hard, crying, and stuttering. Minor also had a breakdown after mother kept calling for welfare checks.

A maternal aunt expressed concern that mother's paranoia was causing her to turn against minor. Mother would wrongly accuse minor of being rebellious and aggressive.

Another maternal aunt described an incident in 2019 when mother had said that she felt someone was taking over her body and starting yelling in a different, deeper voice. In June 2019, mother thought she was possessed and needed an exorcism. Mother had also told the aunt that she practiced at a shooting range in case she ever needed to shoot at father and his girlfriend.

A sheriff's deputy reported that from July through September 2020, mother had made six calls requesting welfare checks at father's home. The deputies who conducted the most recent welfare check indicated that minor appeared happy and that there were no signs of abuse. Minor had, however, expressed that he was afraid of mother.

B. <u>Visitation</u>

Mother had visitation with minor on Saturdays, with the maternal grandfather acting as a monitor. Minor reported: "'The visits are so so. She was kind of fine.'" When asked to elaborate, minor stated, "'Everything scares me, she shouts, gets mad at me, she shouts at grandpa and I feel bad. She gets frustrated, she says things that are not true.'" Minor did not feel safe and said that mother wanted to "'cheat[,]'" meaning that she did not want to follow the rules and wanted to go where no one could see them.

C. <u>DCFS's recommendation</u>

DCFS recommended that the juvenile court sustain the dependency petition and then terminate jurisdiction with a family law order granting father sole physical and legal custody of minor with visitation for mother with a professional monitor.

VIII. *Last Minute Information for the Court (Sept. 28, 2020)*

DCFS obtained copies of some of mother's mental health records. These records disclosed that during an emergency room visit on October 11, 2019, mother reported having auditory hallucinations for the past eight months. Mother believed that demons were attacking her. Mother had denied suicidal or homicidal ideation.

According to a letter from the Department of Mental Health, mother attended a mental health assessment on August 26, 2020. She denied any current mental health symptoms or impairments. Mother was offered individual therapy, but she refused services.

Minor's therapist reported that she had an intake session and two follow-up sessions with minor. Minor indicated that he did not want to see mother. The therapist stated: "'[Minor] loves his mother but her behaviors cause him anxiety and discomfort.

9

It is possible that he didn't realize the discomfort then. Now that he is in father's care, he is in a much normal [*sic*] environment and feels the difference. . . .'" The therapist did not have any concerns about father.

IX. *Adjudication Hearing*

The adjudication hearing was held on October 14, 2020.

A. <u>Mother's testimony</u>

Mother testified that she had been diagnosed with psychosis. A doctor prescribed Abilify, but mother only took it for three days because she started feeling nauseated. Mother was not currently taking any medication. Mother denied that she was currently hearing voices.

Mother was enrolled in a parenting program and was on the waiting list for individual therapy. The day before, she had seen a "psychiatrist, nurse practitioner" and planned to continue that once a month. She stated that she would be willing to take any medication if prescribed by a doctor.

B. <u>Jurisdictional findings and dispositional orders</u>

After entertaining oral argument, the juvenile court sustained the dependency petition and declared minor a dependent of the court. As amended, the sustained count under section 300, subdivision (b)(1), alleged: "The child['s] . . . mother . . . has an unresolved history of mental and emotional problems, which renders the mother incapable [of] providing regular care for the child. On multiple occasions the mother was hospitalized for the evaluation and treatment of mother's psychiatric condition. The mother has failed to take . . . psychotropic medications as prescribed. Such mental and emotional condition on the part of the mother endangers the child's physical health and safety and places the child at risk of

10

serious physical harm, damage, and failure to protect." Father was nonoffending.[3]

The juvenile court removed minor from mother, finding that pursuant to section 361, subdivision (c)(3), there was a substantial danger if minor were returned to her custody and that there were no reasonable means to protect minor absent removal. Minor was placed with father under DCFS supervision.

Explaining that mother was "willing to engage in services" and expressing concern that if the case were closed "the child's relationship with his mother is not being to get addressed[,]" the juvenile court declined to terminate jurisdiction.

The juvenile court ordered reunification services for mother including a parenting program, conjoint counseling with minor, individual counseling, a psychiatric evaluation, and an order to take prescribed psychotropic medications. The court further ordered mother's visitation with minor to be monitored and to take place in a therapeutic setting.

X. *Appeals*

Following the adjudication hearing, mother and DCFS each filed a timely notice of appeal.

## DISCUSSION

I. *Jurisdictional Findings*

Mother argues that the juvenile court's jurisdictional findings under section 300, subdivision (b)(1), are not supported by substantial evidence.

A. <u>Applicable law</u>

Under section 300, subdivision (b)(1), the juvenile court has jurisdiction over and may adjudge to be a dependent of the court

---

[3] DCFS agreed that father was nonoffending, and no allegations regarding father appear in the sustained petition.

11

a "child [who] has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of his or her parent . . . to adequately supervise or protect the child, . . . or by the inability of the parent . . . to provide regular care for the child due to the parent's . . . mental illness . . . ." A jurisdictional finding must be made by a preponderance of the evidence. (§ 355, subd. (a); *Cynthia D. v. Superior Court* (1993) 5 Cal.4th 242, 248.)

Although "'[h]arm to a child cannot be presumed from the mere fact the parent has a mental illness[]'" (*In re Travis C.* (2017) 13 Cal.App.5th 1219, 1226 (*Travis C.*)), a parent's mental illness and failure to consistently treat it may place a child at substantial risk of serious physical harm. (*Id.* at pp. 1226–1227.) "It is not necessary for DCFS or the juvenile court to precisely predict *what* harm will come to [a child] . . . . Rather, it is sufficient that [the parent's] illness and choices create a substantial risk of *some* serious physical harm or illness." (*Ibid.*)

A juvenile court "need not wait for disaster to strike before asserting jurisdiction. [Citation.] This is why the statute uses the word 'risk.'" (*In re K.B.* (2021) 59 Cal.App.5th 593, 603 (*K.B.*).)

B. Standard of review

We review jurisdictional findings for substantial evidence— "evidence that is reasonable in nature, credible, and of solid value. We do not reweigh the evidence, evaluate the credibility of witnesses or resolve evidentiary conflicts. We draw all legitimate and reasonable inferences in support of the judgment." (*In re D.B.* (2018) 26 Cal.App.5th 320, 328 (*D.B.*).)

C. Analysis

Statements by numerous family members, mother's medical records, and mother's own admissions provide ample evidence that mother suffered from serious, uncontrolled mental illness, which placed minor at substantial risk of serious harm.

Mother had been diagnosed with psychosis. She had experienced auditory hallucinations for at least several years and panic attacks. The voices told her to harm herself and others. The juvenile court did not need to credit mother's testimony at the adjudication hearing that she was no longer hearing voices. Instead, the court could rely on mother's earlier statements that she had been hearing voices for three years and that the frequency of the voices was increasing, becoming more constant and persistent over the past year.

Moreover, mother was in denial about the severity of her mental illness and had not taken sufficient steps to control it. She had failed to follow through with treatment recommendations and had stopped taking prescribed psychotropic medication after only three days.

A nexus existed between mother's mental illness—in particular, her auditory hallucinations—and a risk of physical harm to minor. The voices told mother to do "'bad things'" including to kill herself and hurt others. The record supports the inference that mother might act on what the voices told her to do. For example, according to a maternal aunt, mother was obsessed with obtaining revenge on father and had purchased items with the intent of putting a spell on him. The maternal aunt expressed concern that mother was turning against minor, including wrongly accusing him of being rebellious and aggressive. Mother had told another maternal aunt that she

13

practiced at a shooting range in case she ever needed to shoot at father and his girlfriend.  Mother had showed father a gun that she had purchased.

Even if mother did not intend to cause harm to minor, her violent ideations toward herself and others placed minor at significant risk of physical harm as a bystander and justified jurisdiction under section 300, subdivision (b)(1).  Neither DCFS nor the juvenile court was required "to precisely predict *what* harm" would come to minor.  (*Travis C.*, *supra*, 13 Cal.App.5th at pp. 1226–1227.)

Urging reversal, mother argues that the juvenile court focused on the fact that mother had mental health issues rather than finding that minor had suffered or was at risk of suffering any serious physical harm or illness.  We disagree.  By sustaining the petition, the court expressly found that mother's mental and emotional condition placed minor at risk of serious physical harm.  And, as discussed above, substantial evidence supports that finding.  That the court's comments during the adjudication hearing did not expound on the risk of physical harm to minor is not a basis for reversal.  (See *In re Daniel B.* (2014) 231 Cal.App.4th 663, 675, fn. 4 ["'"[i]t is judicial action and not judicial reasoning which is the subject of review"'" on appeal"].)

Mother also points to selected evidence that she claims show that she was a good parent, who provided minor with a stable home and appropriately cared for his medical needs.  The substantial evidence standard of review does not permit us to reweigh the evidence.  (*D.B.*, *supra*, 26 Cal.App.5th at p. 328.)  Having identified substantial evidence to support the finding of jurisdiction, "it is of no consequence" that other evidence or inferences drawn from the evidence might have supported a

contrary finding. (*Bowers v. Bernards* (1984) 150 Cal.App.3d 870, 874, italics omitted.)

Finally, we find unavailing mother's reliance on three cases reversing jurisdictional findings premised on a parent's mental illness: *In re Joaquin C.* (2017) 15 Cal.App.5th 537; *In re James R.* (2009) 176 Cal.App.4th 129, abrogated in part by *In re R.T.* (2017) 3 Cal.5th 622 (*R.T.*); and *In re David M.* (2005) 134 Cal.App.4th 822, abrogated in part by *R.T., supra*, 3 Cal.5th 622. None of these cases involved the situation that exists here, where mother's mental illness manifests in auditory hallucinations directing her to hurt herself and others and where mother's behavior frightened minor and caused him anxiety. Here, unlike the cases cited by mother, a substantial risk of harm to minor can be inferred from the record without resorting to speculation.

II. *Dispositional Order Removing Minor*

Mother also contends that substantial evidence does not support the juvenile court's dispositional order removing minor from her custody.

A. <u>Applicable law</u>

Before removing a minor from a parent's custody, the juvenile court is required to "make one of five specified findings by clear and convincing evidence. (§ 361, subd. (c).)" (*In re V.L.* (2020) 54 Cal.App.5th 147, 154 (*V.L.*).) One ground for removal is that "[t]he minor is suffering severe emotional damage, as indicated by extreme anxiety, depression, withdrawal, or untoward aggressive behavior toward himself or herself or others, and there are no reasonable means by which the minor's emotional health may be protected without removing the minor

15

from the physical custody of his or her parent . . . ."  (§ 361, subd. (c)(3).)

"""Clear and convincing' evidence requires a finding of high probability.  The evidence must be so clear as to leave no substantial doubt.  It must be sufficiently strong to command the unhesitating assent of every reasonable mind.  [Citations.]'" (*V.L.*, *supra*, 54 Cal.App.5th at p. 154.)

B.  <u>Standard of review</u>

We review a dispositional order removing a minor from parental custody for substantial evidence.  (*V.L.*, *supra*, 54 Cal.App.5th at p. 154.)  Because the juvenile court must make its finding that removal is warranted under the clear and convincing evidence standard of proof (*K.B.*, *supra*, 59 Cal.App.5th at p. 605), "the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."  (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.)

C.  <u>Analysis</u>

We find substantial evidence exists from which the juvenile court could find it highly probable that minor was suffering severe emotional damage and that there were no reasonable means to protect minor's emotional health absent removal from mother's custody.  (§ 361, subd. (c)(3).)

Contrary to mother's contention that "overall [minor] was a happy, well-adjusted child[,]" the record reflects that mother's mental illness was having profound detrimental effects on minor.  According to his therapist, mother's behavior caused minor anxiety and discomfort.  Family members had observed minor becoming withdrawn in the weeks preceding the referral.

Mother's behavior caused minor to suffer psychological "breakdowns." On one occasion, minor "started to cry and sat on the floor in [a] fetal position rocking back and forth." Father reported that when he would ask minor how things were going, minor would start breathing very hard, crying, and stuttering. Minor also repeatedly expressed his fear of mother.

Mother argues that reasonable alternatives to removal existed, which the juvenile court did not consider. She points to her plan to continue psychotherapy and willingness to undergo a psychiatric assessment and take any medication prescribed to her. As a result, mother contends that the court could have conditioned minor's return to mother's home on mother's compliance with therapy and medication. Mother also suggests that frequent unannounced visits from a social worker could have ensured minor's safety.

The juvenile court could reasonably find that such alternatives would not sufficiently protect minor's emotional health. Even if mother did comply with therapy and medication, the amount of time it would take for her to exhibit signs of improvement and whether such improvement would abate the harm to minor were uncertain. Further, any unannounced visit could "only assess the situation . . . at the time of the visit." (*In re A.F.* (2016) 3 Cal.App.5th 283, 293.) This was particularly concerning given that mother's conduct even during monitored visitation had been problematic. According to minor, mother wanted to break the visitation rules and evade monitoring. Mother would shout and get angry at minor. Minor did not feel safe with her.

Accordingly, the alternatives suggested by mother did not obviate the need to remove minor from mother at the time of the adjudication hearing.

III. *Order Retaining Jurisdiction*

In its cross-appeal, DCFS contends that the juvenile court erred by not terminating its jurisdiction over minor.

A. <u>Applicable law</u>

When a juvenile court removes a child from a parent under section 361, it is required to "first determine whether there is a parent of the child, with whom the child was not residing at the time that the events or conditions arose that brought the child within the provisions of [s]ection 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child." (§ 361.2, subd. (a).)

If the juvenile court places the child with the previously noncustodial parent, the court has three options. First, it may "[o]rder that the parent become legal and physical custodian of the child" and "then terminate its jurisdiction over the child." (§ 361.2, subd. (b)(1).) Second, it may "[o]rder that the parent assume custody subject to the jurisdiction of the juvenile court and require that a home visit be conducted within three months." (§ 361.2, subd. (b)(2).) Third, it may "[o]rder that the parent assume custody subject to the supervision of the juvenile court." (§ 361.2, subd. (b)(3).)

If the juvenile court selects the third option, it "may order that reunification services be provided to the parent or guardian from whom the child is being removed, or the court may order

18

that services be provided solely to the parent who is assuming physical custody in order to allow that parent to retain later custody without court supervision, or that services be provided to both parents, in which case the court shall determine, at review hearings held pursuant to [s]ection 366,[4] which parent, if either, shall have custody of the child."  (§ 361.2, subd. (b)(3).)

B.  <u>Standards of review</u>

We review the juvenile court's decision to continue jurisdiction for an abuse of discretion.  (See *In re A.J.* (2013) 214 Cal.App.4th 525, 535, fn. 7 (*A.J.*).)  "A court abuses its discretion only when ""the trial court has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.""""  (*In re Caden C.* (2021) 11 Cal.5th 614, 641.)  Factual findings of the juvenile court are reviewed for substantial evidence.  (*A.J.*, *supra*, at p. 535, fn. 7.)

C.  <u>Analysis</u>

The juvenile court's decision to place minor with father, order reunification services for mother, and to retain jurisdiction was expressly authorized under section 361, subdivision (b)(3). DCFS nevertheless argues that the court abused its discretion by

---

[4]      Section 366 provides, in part, that "[t]he status of every dependent child *in foster care* shall be reviewed periodically as determined by the court but no less frequently than once every six months . . . ."  (§ 366, subd. (a)(1), italics added.)  "[W]hile review hearings are to be held pursuant to section 366 when a child is placed with a previously noncustodial parent pursuant to subdivision (b)(3) of section 361.2—this does not mean that all of the procedures prescribed by section 366 et seq. 'must be rigidly applied and followed verbatim when the status review is of a child who has not been placed in foster care.'"  (*In re Jaden E.* (2014) 229 Cal.App.4th 1277, 1286.)

19

failing to terminate its jurisdiction because there were no safety issues concerning minor's placement with father and minor wished to remain in father's custody.

We find no abuse of the juvenile court's discretion.

The juvenile court's decision was explicitly grounded in its concern for minor's well-being. If jurisdiction was terminated, the court reasoned, minor's relationship with mother may never be "addressed." Given that mother had been minor's primary caretaker for most of his life and minor had repeatedly expressed his love and concern for her, the court could reasonably conclude that continuing to supervise efforts at rehabilitating the relationship between minor and mother served minor's best interests. After all, the general purpose of juvenile dependency laws is "to preserve and strengthen the minor's family ties whenever possible[.]" (§ 202, subd. (a).)

The juvenile court also found that mother was "willing to engage in services." This finding was supported by substantial evidence: Mother testified that she was enrolled in a parenting class, was on a waiting list for individual therapy, had recently sought psychiatric treatment which she planned to continue, and would be willing to take any medication prescribed by a doctor. Given mother's stated willingness to engage in services, we cannot say that continuing jurisdiction and ordering reunification services for mother, including conjoint counseling between mother and minor and visitation in a therapeutic setting, was arbitrary, capricious, or patently absurd.

20

**DISPOSITION**

The findings and orders are affirmed.

<u>NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS</u>.


_____, J.
ASHMANN-GERST


We concur:


_____, P. J.
LUI


_____, J.
HOFFSTADT