Filed 7/31/25  In re A.R. CA2/2

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION TWO

| | |
|---|---|
| In re A.R., a Person Coming Under the Juvenile Court Law. | B338341 (Los Angeles County Super. Ct. No. 24CCJP00983) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff and Respondent, v. JESSICA M., Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, Brett Bianco, Judge.  Affirmed.

Rita Himes, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn R. Harrison, County Counsel, Kim Nemoy, Assistant County Counsel, and Jane Kwon, Deputy County Counsel, for Plaintiff and Respondent.

Jessica M. (mother) appeals from a juvenile court judgment asserting jurisdiction over her son A.R. (born February 2024) and a dispositional order removing him from her custody. Mother challenges the jurisdictional findings under Welfare and Institutions Code section 300, subdivisions (a) and (b) involving her behavior.[1] Further, mother argues a lack of clear and convincing evidence that no reasonable means were available to prevent or eliminate the need for removal. We find no error and affirm the judgment, jurisdictional findings and challenged dispositional order in full.

## COMBINED FACTUAL AND PROCEDURAL BACKGROUND

**Initial removal and investigation**

On March 25, 2024, the Los Angeles County Department of Children and Family Services (DCFS) received a referral alleging domestic violence in the home of mother and her newborn baby, A.R. The caller reported mother disclosed someone in the home "gets upset, punches holes in the wall, and breaks things." The caller also reported mother had not taken the baby to the doctor. The caller had observed mother and the baby in the home and reported mother filled up a baby bottle and propped it up in the bassinet then walked away, without ensuring the baby was able to feed. During the time the caller was with mother and child, mother did not touch the baby.

On March 26, 2024, DCFS received a second referral. The caller reported David R. (father) had disclosed that on the prior evening when A.R. was crying, mother responded by "getting

---

[1] All further undesignated statutory references are to the Welfare and Institutions Code.

upset and shaking the baby."[2]  It was reported mother shook the baby "a little."

On March 26, 2024, a DCFS social worker went to mother's home.  Mother appeared confused as to why anyone would be concerned about the safety of the baby and then displayed an inability to properly hold A.R.  Despite the social worker's prompts, mother failed to provide support for A.R.'s head and neck.  The baby cried throughout the interview.  Mother attempted to feed A.R., but the bottle was nearly empty, and he was sucking air.  The social worker prompted mother to make a new bottle.  Mother continued to hold A.R. by the waist at her hip and failed to support his head.  The social worker had to intervene and hold the child while mother prepared the bottle.  After the baby was fed, mother laid him on the bed.  When the social worker inquired as to whether mother would burp the baby, mother responded, "He burps on his own."

Mother told the social worker she lived with father.  Though they were homeless during mother's pregnancy, they just moved into the apartment two months earlier.  Mother was receiving "Section 8" housing assistance and help from Saint John's Outreach church.  Mother denied receiving prenatal care.  During this conversation law enforcement arrived.  Mother stated, "I can't be arrested, I have to go to a concert."  Mother continued to reiterate she needed to go to a concert, but provided no details.

Mother admitted having received a diagnosis of bipolar disorder but was not seeing a therapist or taking medication at that time.  Mother stated her therapist quit, and she stopped taking medication when she stopped therapy.  Mother stated she

---

[2]     Father is not a party to this appeal.

3

felt stressed and had not slept in two days, adding she sometimes cries for 30 minutes. When she feels this way, she takes Tylenol.

Mother admitted she and father sometimes argue. Mother first described their arguments as yelling and name-calling, including father calling her "retarded" when she does not know how to soothe the child or does not clean properly. Mother then disclosed that during the previous week, after yelling at her for not cleaning the kitchen properly, father grabbed her by the neck. Mother admitted to being afraid of father and of his return home due to his aggressive behavior and verbal abuse. Mother denied ever calling law enforcement due to father's behavior.

The social worker noticed A.R.'s right eye was swollen, crusted, and red, with yellow discharge coming out. When asked about the baby's eye, mother said she brought it up to the doctor the week before at the Venice Family Clinic. The baby was prescribed antibiotics, but mother did not know where to go to get the medication. Therefore, the infant's eye was not treated. Mother denied returning to the health clinic and shaking A.R.

The social worker informed mother A.R. needed to be seen by a doctor. Mother agreed but became visibly upset. Mother began making calls, and when no one answered, mother asked the social worker, "what did you do to my boyfriend, he's not answering my calls." Mother began threatening the social worker by saying she "better leave." Mother then sat on her bed and scrolled through social media.

The social worker asked mother to prepare A.R. to be taken to the doctor, observing his diaper was full. Mother stated she changed the diaper "10 minutes ago," and refused to assist the social worker in finding clothes for A.R. Though mother did not get off her phone, she did point to the bassinet for the social worker to look for clothes for A.R. The social worker observed

4

five dirty onesies in the bassinet, covered in dog hair. A few of the suits were wet around the diaper area and smelled of urine. The social worker asked mother if there were clean clothes for the baby and mother said "no."

The social worker asked mother if she planned to ride in the ambulance taking the baby to the hospital. Mother responded, "No, you can go." The social worker continued to encourage mother to accompany A.R. to the hospital; mother continued to respond in the negative. Mother said, "no, because you are going to think you run my place," and "why would I go in the ambulance with all those men." Mother also stated she needed to stay with her dog and that "the people in the ambulance kill people." Overall, mother continued to make statements that made no sense and refused to go with A.R. in the ambulance.

Mother did not want to engage further with the social worker and asked the social worker to leave her home.

A different social worker continued the interview with mother, who confirmed father was the father of the child and had signed the birth certificate. Mother informed the social worker her ex-boyfriend had recently arrived at the home unannounced several times and called her names such as fat and retarded, and threatened to "choke [her] out." Last week, the ex-boyfriend arrived at the home and began by calling her "retarded" due to the way she was cleaning, and eventually "had one of his tantrums" and choked her. Mother denied contacting law enforcement after this incident.

Mother stated she had been diagnosed with postpartum depression, but was unable to describe the symptoms she experienced. Mother stated she currently takes Tylenol and used to take Risperidone for bipolar disorder. The last time she took

5

her medication was "a long time ago." Mother reiterated she had not slept in two days and was unable to identify a therapist, psychiatrist, or pharmacy for her medication.

The social worker heard mother make paranoid statements, have lateral thinking, abruptly change topics, and not to be oriented to time and place. Mother denied understanding the severity of A.R.'s condition and declined to join the team at the hospital. When the social worker asked mother if she would like to meet the team at Harbor UCLA hospital, mother responded, "No, I don't want to leave my dog and have people come into my home." Mother was unable to identify the individuals she was fearful would enter her home.

The social worker met the apartment manager at the referral address and inquired about the family. The manager stated the family had been living there for about two months. Recently, he had to speak with the family as he received noise complaints late at night. He denied having any concerns for child abuse or neglect. A neighbor, who wished to remain anonymous, reported mother and father were always arguing, but denied observing or hearing any physical altercations.

The social worker who accompanied A.R. to the hospital telephoned mother to see if she had any recommendations for soothing the baby, as he was inconsolable. Mother denied having solutions. When the social worker asked if mother would like to speak to the baby to assist in soothing him, mother declined. The social worker encouraged mother to come to the hospital, but mother continued to decline, stating, "I don't want to come and be arrested." When the social worker asked why mother would be arrested, mother said she had not hurt her baby, instead it was her ex-boyfriend.

A.R. showed no immediate signs of neurological or gross motor deficits.  A head CT scan disclosed no immediate concerns.  There were no obvious or suspicious signs of head trauma associated with shaken baby syndrome.

The emergency room doctor also denied seeing signs of trauma upon an initial external exam.  A.R. was active, crying, with drainage from his eye. A.R. did not have initial injuries typical of being shaken.

**Field interviewers with RAND Corporation**

Tieryn Bills was a field interviewer for RAND Corporation.  She knew father through his participation in a longitudinal public health study being undertaken by her employer.  She had known father for about a year, and met with him about once a month.

Bills reported father had disclosed domestic violence in the relationship between him and mother during and after her pregnancy.  Father described the domestic violence as "throwing things" and yelling.  Father admitted hitting mother during and after her pregnancy, but did not describe how.  Bills reported father told her mother was upset with the child the other night and shook the baby "a little."  Father provided no further details on the incident.  Bills interviewed father approximately once a month, and father admitted using "acid, mushrooms, codeine, PCP and marijuana" within the last three months.  Father disclosed he had PTSD but revealed no other diagnosis.  Bills stated father is paranoid and sometimes makes statements regarding being afraid of spirits.  Father disclosed he had not taken A.R. for medical care since his birth.

Sally Nowak was a field interviewer for RAND Corporation.  She had worked in that capacity for two years and had come to know mother "as part of a year long longitudinal study about

former foster youths that were experiencing homelessness." The survey involved tracking these individuals' path to housing. Nowak had been interviewing mother every month for a year and also knew mother from a previous job she had at an organization called "Safe Place for Youth" (SPY). Including her knowledge of mother at SPY, Nowak had known mother since 2018 or 2019. Mother had disclosed domestic violence to Nowak, including "breaking and throwing things." In addition, mother had a history of being aggressive. She was seen kicking, punching, and hitting her prior partner at the SPY drop-in center. Nowak visited mother two weeks after A.R.'s birth. During the one-half hour visit, mother did not pick up, hold, or touch A.R. at all. When A.R. cried, mother propped up a bottle on a blanket to feed the infant. Mother did not pick up the baby even after Nowak told mother there was a choking hazard and directed her to pick up the child.

**Initial detention**

On March 27, 2024, a Harbor UCLA social worker reported A.R. had no signs of child abuse or neglect and could be discharged. No parent had visited A.R. in the hospital.

On March 27, 2024, mother confirmed she had not visited A.R. in the hospital. She was on her way to Las Vegas because she did not believe she would be able to see the child. When the social worker questioned mother's decision to go to Las Vegas, mother hung up the phone. Due to the parents' failure to pick up A.R. at the hospital, he was placed in foster care with a resource family.

In its March 29, 2024 detention report, DCFS explained the reasonable efforts made to prevent or eliminate the need for A.R.'s removal from the home. DCFS set forth the preplacement preventative services that were provided, including case

management; interviews of all parties and assessment of the child; initiation of a CLETS request; making and returning calls regarding the status of the case to all interested parties; and explanation of the court process and date, time, location and directions to the court hearing to all interested parties. DCFS suggested providing referrals to mother and father for services, which could prevent the need for further detention, including domestic violence, anger management, parenting classes, individual therapy, psychiatric assessment, and drug and alcohol programs.

**Petition and detention hearing**

On March 28, 2024, DCFS filed a section 300 petition alleging mother physically abused A.R. by shaking him, and father failed to protect the child; the parents had a history of engaging in violent altercations; mother had unaddressed mental and emotional problems; and father had substance abuse issues.

The detention hearing took place on March 29, 2024. The juvenile court found father was A.R.'s presumed father; DCFS made reasonable efforts to prevent the child's removal; and there were no services available to prevent the child's continued detention. The court removed A.R. from parental custody and ordered monitored visits for the parents. The court ordered DCFS to provide the parents with appropriate low cost or no cost referrals and a written visitation schedule.

**Continued investigation**

On April 10, 2024, a dependency investigator (DI) interviewed mother in person, at the family home, with father present. Mother displayed some difficulty in understanding parts of the interview and disclosed having an intellectual disability. Mother reported being diagnosed with a learning disability as a child and being partially deaf. Mother denied shaking or abusing

A.R. Mother stated it was dangerous for them to live on the second floor due to the stairs, explaining, "When we use the stroller, the baby's bouncing up and down when we use the stairs." The DI explained the baby should be taken out of the stroller and carried up the stairs separately from the stroller instead of pushing the stroller up and down the stairs with the baby inside. Mother responded, "Oh, okay."

Mother denied violent altercations with father, claiming disagreements and arguments, but they never hit each other or threw things at each other.

Mother confirmed her mental health diagnosis but said she ran out of her medications and had not yet obtained a refill. She was diagnosed with bipolar disorder and attention deficit disorder. She was prescribed risperidone, fluoxetine, and Vyvanse. Mother reported feeling depressed since A.R. was removed and had an upcoming appointment at Venice Family Clinic on April 16, 2024. She also confirmed she would provide a printout of her new medication list to the DI.

Mother said her ex-boyfriend in Missouri was abusive and their relationship ended in 2019 after three months when he strangled her. Mother denied her ex-boyfriend ever came to Los Angeles or her home. Mother denied any alcohol or drug abuse by father. She knew father had a history of drug use but said he now only used marijuana at the beach, never in the home.

On April 10, 2024, the DI interviewed father in mother's presence. Father walked around the house doing chores during the interview. He spoke clearly but regularly paused after questions to make a face or laugh before continuing his statements. Father appeared to the DI to be under the influence due to his flushed face, lack of eye contact, and manner of speech. He later admitted to using marijuana earlier that morning.

10

Father disclosed having been in special education classes as a minor.

Father denied mother shook A.R., and believed the allegation had to do with the stairs. Father also denied the domestic violence allegations. Father said there were no fights between him and mother. The neighbors did not like them because they were new and talked loudly. Father said mother could not hear in one ear, so she did not know how loud she was at times.

Father was not concerned with mother's ability to care for A.R., saying he would protect A.R. by "us[ing] [his] clairvoyance to stop it before it occurs." Father had not noted any mental health problems in mother other than depression since A.R.'s detention. Father disputed the drug allegations and stated he smoked between three and one-half and four grams of marijuana, with a maximum of five to seven grams of marijuana, approximately every other day. He smoked when he needed a break, and he did it at the beach where he worked out, never in the home.

On April 13, 2024, A.R.'s caregivers reported having no concerns except the parents had not reached out to ask about A.R. since his placement.

On April 25, 2024, the DI interviewed maternal great-grandmother Lori M. Lori reported she had "lots of concerns" about mother, that mother had a lot of mental health issues, and "there is no way that she can take care of a baby." Lori was unsure if mother had developmental delays, but reported mother could barely take care of herself.

On May 7, 2024, DCFS received a report of a related referral dated February 7, 2024, that mother had left Indiana for Los Angeles. Mother had been adopted as a minor and kept in

11

touch with her biological mother, Melanie L.  Mother was reported to be mentally unstable, and the matter was referred to "Community Prevention Linkage."  Father too was a prior dependent who aged out of the foster care system in 2017.  Father had a criminal history from 2019 to 2024 involving obstruction of a peace officer, battery, and battery with serious bodily injury.

On May 9, 2024, mother told the DI she did not have a psychiatrist and had not refilled her prescriptions.

The social worker informed the DI mother struggled with lucidity, and both parents minimally engaged with A.R.

On May 10, 2024, the DI met with mother and obtained a release of information form for Venice Family Clinic and the Department of Mental Health.  The DI assisted mother in calling mental health providers to link her to a psychiatrist and therapist.  Mother obtained an in-person intake appointment for May 21, 2024, at Augustus Hawkins Mental Health Center, along with a bus pass from the social worker.  Mother informed the DI she had been diagnosed with an intellectual disability in her youth but did not know if she still had it.  She also had seizures as a foster youth.

Both mother and father were open to receiving developmental assessments and supportive services.  The DI assisted mother and father with filling out Regional Center intake applications.

On May 21, 2024, mother's case manager from SHEILDS for Families Healthy Start Program reported having been unsuccessful in assessing mother for their program because mother could not comprehend basic questions, easily lost focus, and ranted about unrelated topics.

12

From May 21 to 24, 2024, the parents reported receiving disturbing and violent threats from father's ex-girlfriend. The DI and social workers repeatedly recommended the parents file police reports, change the locks to their home, avoid areas the ex-girlfriend frequented, and consider filing for a restraining order. Father repeatedly minimized the situation and said police and court interventions were not necessary. The parents were not willing to take any actions to protect themselves.

The social worker who monitored the parents' visits with A.R. continued to be concerned with the parents' engagement with A.R. They required extensive encouragement and modeling as to how to appropriately interact with A.R., including how to hold, soothe, and bond with him. The parents also required many redirections because they would engage with the social worker instead of the child.

During a May 3, 2024 visit, father exhibited limited parental knowledge. When mother was asked if she wanted to hold A.R., she responded, "no, give him to [father]." Mother did not hold the baby during the visit and did not understand that A.R. was too young to talk or eat solid foods. The parents bickered for several minutes during the visit, and the social worker ended the visit early for fear of escalation.

During a May 17, 2024 visit, mother could not hold the baby properly even after the social worker explained the baby's muscles were not strong enough for him to support himself. Mother declined to adopt the social worker's suggestions for soothing him, and failed to engage with the infant when he became fussy. The social worker modeled soothing techniques then returned the baby to mother. Mother constantly checked her phone while holding the baby and ended the visit early upon father's arrival. During father's visit, father failed to properly

support the infant's head and made minimal efforts to engage with the child. Father was unable to calm A.R. and handed him to the social worker. Father informed the social worker mother gave random people their address, and those people broke into their apartment, stole father's cell phone, and were trying to steal A.R. Father did not like going home until late because mother did not know how to clean the apartment and did not understand when he tried to teach her.

Between April 16 and May 11, 2024, mother had three in-person visits with A.R. and father had four.

DCFS noted mother and father had limited social connections, and both reported only having each other. Father had limited contact with his family; the paternal grandmother was deceased; and paternal grandfather was deported when father was younger. Mother did not have a relationship with her adoptive parents and had limited contact with her biological family.

**Jurisdiction and disposition hearing**

The jurisdiction and disposition hearing was held on May 31, 2024. Mother and father were present on WebEx and were represented by counsel. The court took judicial notice of the file, admitted exhibits, and heard testimony.

Bills testified she had known father for about a year and met with him monthly. Father reported domestic violence with mother both before and after her pregnancy. Father did not describe the domestic violence, but did say he was hitting mother. During their meeting in March, father reported mother had shaken the baby a little. Father did not elaborate what "shaking a little" meant, but he said mother was frustrated. Father also disclosed drug use.

14

Nowak also testified.  She had known mother since 2018 or 2019 while she was a counselor at SPY.  While at SPY, mother and father got into a physical altercation and were asked to leave.  During their March 2024 meeting, mother said "things [get] broken in the[ir] apartment" during arguments.  Mother did not specify who breaks things.  Nowak reported mother had "a history of being timed-out for violence with . . . just not with current partners but with other friends or partners as well . . . ."

After hearing argument, the juvenile court sustained the following allegations:

a-1, b-1:  "On a prior occasion, the child['s] . . . mother . . . physically abused the two month old child by shaking the child.  Such physical abuse was excessive and caused the child unreasonable pain and suffering.  The child's father . . . knew of the physical abuse of the child by the mother and failed to protect the child. . . .  Such physical abuse of the child by the mother and the father's failure to protect the child endanger the child's physical health and safety and place the child at risk of serious physical harm, damage, danger, physical abuse and failure to protect."

a-2, b-3:  "The child['s] . . . mother . . . and father . . . have a history of engaging in violent altercations.  On prior occasions, the father struck the mother, during the mother's pregnancy with the child.  On prior occasions, the mother and father broke and threw objects in the child's home.  Such violent conduct on the part of the mother and the father endangers the child's physical health and safety, creates a detrimental home environment and places the child at risk of serious physical harm, damage and danger."

b-2:  "The child['s] . . . mother . . . has mental and emotional problems, including a diagnosis of Bi-Polar Disorder, which

15

render the mother incapable of providing regular care of the child.  The mother failed to regularly take the mother's psychotropic medication, as prescribed.  Such mental and emotional problems on the part of the mother endanger the child's physical health and safety and place the child at risk of serious physical harm, damage and danger."

The court also sustained an allegation concerning father's drug use.

In sustaining the physical abuse counts, the court noted "[t]he physical abuse is evident from the evidence in that mother was resorting to shaking the child out of frustration."  The court did not believe the parents' explanation the child was "jostled around while in the stroller going up and down the stairs," describing the court's view of that evidence as "an excuse."

The court found DCFS made reasonable efforts to prevent removal and there were no services available to prevent further detention.  The court removed A.R. from parental custody and ordered reunification services for the parents.

The court noted "we should have a Regional Center referral for both mother and father on their case plan," as well as "730 evaluations for the parents."  The court stated, "This is going to require a significant amount of effort on [DCFS's] part to provide the parents with supportive service and essentially hold them by the hand and walk them to those programs and help them with what they need to do."  The court specified mother's case plan would include a domestic violence program for victims, at which point mother interrupted the court, stating, "I'm not a victim." The court muted mother's microphone.  The parents were granted monitored visitation.

The court found by clear and convincing evidence "it wouldn't be appropriate to have the child in [the parents'] care at

16

this time until we get these issues addressed and get a better understanding of the capacity of the parents to be parents and protective of the child."

On June 3, 2024, mother filed her notice of appeal.

## DISCUSSION

Mother challenges the sufficiency of the evidence supporting the two jurisdictional findings involving her, as well as the juvenile court's finding DCFS made reasonable efforts to prevent A.R.'s detention and no reasonable means existed to avoid A.R.'s continued detention and removal. We discuss each issue separately below and conclude the record supports the juvenile court's findings.

### I. Substantial evidence supports the jurisdictional findings

#### A. *Mootness*

Mother acknowledges she does not challenge all of the jurisdictional findings made by the juvenile court. Mother also acknowledges "where there are multiple findings against one parent[,] the validity of one finding may render moot the parent's attempt to challenge the others." (*In re D.P.* (2023) 14 Cal.5th 266, 284 (*D.P.*).) However, mother argues her jurisdictional challenges are not moot because she was likely referred to a Child Abuse Central Index (CACI) listing based on the underlying allegations, and reversal of the findings would assist her in getting the CACI listing removed. Mother cites *D.P., supra*, at page 279, in which the court acknowledged inclusion in CACI can affect a parent's employment, state licensing, volunteer opportunity prospects, and may adversely affect the parent in future dependency proceedings.

17

DCFS acknowledges mother's mootness argument and does not oppose review of mother's arguments on the merits. For this reason, we exercise our discretion to decide mother's jurisdictional challenges on the merits without addressing the mootness issue.[3] (*D.P., supra*, 14 Cal.5th at p. 285.)

**B.** *Applicable law and standard of review*

Section 300, subdivision (a), authorizes jurisdiction if a child has suffered, or there is a substantial risk the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent.

Section 300, subdivision (b)(1), authorizes jurisdiction if a child has suffered, or there is a substantial risk the child will suffer, serious physical harm or illness as a result of any of the following: (A) the failure or inability of the child's parent or guardian to adequately supervise or protect the child; (B) the willful or negligent failure of the child's parent or guardian to adequately supervise or protect the child from the conduct of the custodian with whom the child has been left; (C) the willful or negligent failure of the parent or guardian to provide the child

---

[3]    Mother has filed a request for judicial notice of DCFS's answer brief in the matter of *In re S.R.*, review granted September 11, 2024, S285759 (answer filed Mar. 6, 2025). Mother argues the brief demonstrates DCFS's misunderstanding of when juvenile dependency jurisdictional findings establish conduct that is reportable to CACI. Because DCFS does not oppose review of mother's arguments on the merits, and does not challenge mother's position that inclusion on the CACI could create prejudice in the future, we hereby deny mother's request for judicial notice. (*Jordache Enterprises, Inc. v. Brobeck, Phleger & Harrison* (1998) 18 Cal.4th 739, 748, fn. 6 [judicial notice should only be granted of items that are necessary, helpful, and relevant on appeal].)

with adequate food, clothing, shelter, or medical treatment; or (D) the inability of the parent or guardian to provide regular care for the child due to the parent's or guardian's mental illness, developmental disability, or substance abuse.

A challenge to the sufficiency of the evidence supporting the jurisdictional findings is reviewed for substantial evidence. (*In re I.J.* (2013) 56 Cal.4th 766, 773.)  This court must draw all reasonable inferences from the evidence to support the findings, review the record in the light most favorable to the juvenile court's determinations, and recognize that issues of fact and credibility are within the province of the trial court.  (*In re Cole L.* (2021) 70 Cal.App.5th 591, 602 (*Cole L.*).)  To be substantial, evidence "'must be of ponderable legal significance and must be reasonable in nature, credible, and of solid value.'" (*Ibid.*)  Where substantial evidence exists supporting the court's finding, we must "affirm the order even if there is other evidence supporting a contrary finding." (*In re R.V.* (2012) 208 Cal.App.4th 837, 843.)

"Although section 300 requires proof the child is subject to the defined risk of harm at the time of the jurisdiction hearing [citations], the court need not wait until a child is seriously abused or injured to assume jurisdiction and take steps necessary to protect the child.  [Citations.]  The court may consider past events in deciding whether a child presently needs the court's protection." (*Cole L., supra*, 70 Cal.App.5th at pp. 601–602.)

### C.    *Physical abuse—shaking the baby*

Mother first challenges the juvenile court's a-1 and b-1 jurisdictional finding that mother physically abused A.R. by shaking him.  Mother points out the only evidence to support the allegation of dangerous shaking was father's statement to a field interviewer that mother shook A.R. "a little" when she was frustrated.  However, mother argues, the contrary evidence was

substantial.  The baby's examination at the hospital revealed no signs of trauma or any medical concerns.  Mother denied shaking the baby and explained she understood it was dangerous to do so.  Mother argues that slight shaking out of frustration does not create a serious risk of harm within the meaning of section 300, subdivisions (a) or (b)(1).  Mother cites cases involving shaken baby syndrome, all of which involved forceful shaking resulting in an infant's death or serious neurological injury.  (*In re I.I.* (2019) 42 Cal.App.5th 971, 973 [shaken four month-old twins resulted in severe brain injuries and one twin's death]; *Los Angeles County Dept. of Children & Family Services v. Superior Court* (2007) 158 Cal.App.4th 1562, 1564 [shaken infant died]; *J.N. v. Superior Court* (2007) 156 Cal.App.4th 523, 528–529 [shaken 11 month old was in a coma and on life support]; *In re Ashley M.* (2003) 114 Cal.App.4th 1, 5 [shaken infant died]; *Michael P. v. Superior Court* (2001) 92 Cal.App.4th 1036, 1040 [shaken 21 month old suffered brain hemorrhaging and died the following day].)  In contrast, mother argues, there is no evidence she shook A.R. violently or forcefully or that A.R. suffered any injuries.  The substantial evidence is not satisfied by pointing to "'"isolated evidence torn from the context of the whole record."'"  (*In re I.C.* (2018) 4 Cal.5th 869, 892.)  The record here, mother argues, when considered in its entirety, lacks substantial evidence to support the physical abuse findings.

The juvenile court relied on substantial evidence in sustaining the allegations that mother physically abused A.R. by shaking him.  Bills provided evidence that father informed her that mother became frustrated with the baby and shook him a little.  Father told Bills that mother was upset because the baby was crying, therefore she shook the baby.  The evidence from Bills, in the form of written testimony taken during interviews

and live testimony at the jurisdiction hearing, constitutes substantial evidence. Father's minimization of the shaking, characterizing it as "a little," does not change the basic fact that mother became angry with the baby and took out that anger on the baby by shaking him.

Mother attempts to undermine the evidence by suggesting there is reason to question the reliability of the parents' statements to the field interviewers, citing only argument by mother's counsel. The juvenile court also heard mother's counsel's arguments during the hearing and declined to adopt those arguments. Bills testified she had no reason to question father's credibility when he told her of the baby shaking. The juvenile court alone was responsible for making the credibility determination as to Bills's testimony. We do not undermine the juvenile court's credibility determination, even when contrary evidence in the record exists. (*In re R.V., supra*, 208 Cal.App.4th at p. 843.)

Further, there was evidence the parents made excuses for any possible injury to the child. Mother first blamed her ex-boyfriend for injuring A.R. While mother points out her own statements were confused and erratic at times, and the court eventually struck mother's allegations concerning her ex-boyfriend, this argument only serves to undermine mother's denial of the baby shaking. In addition, mother and father both noted the stairs to their apartment were dangerous, and the baby could have been jostled as they pulled him up and down the stairs in the stroller. The trial court did not believe this testimony, finding it was an "excuse." This court may not reweigh the evidence or disturb the juvenile court's credibility determinations. (*In re I.J., supra*, 56 Cal.4th at p. 773.)

21

Mother's argument that A.R. suffered no actual harm from the shaking does not provide a basis for reversal of the finding. "It is not necessary for DCFS or the juvenile court to precisely predict *what* harm will come to [the child]. Rather, it is sufficient that [the parents'] choices create a substantial risk of *some* serious physical harm or illness." (*In re Travis C. (*2017) 13 Cal.App.5th 1219, 1226–1227.) As the cases cited by mother show, the shaking of a baby can result in serious injury or death. "'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J., supra*, 56 Cal.4th at p. 773.)

The juvenile court's determination that A.R. was at risk of physical harm due to mother's shaking him out of frustration was supported by substantial evidence in the record. Mother failed to satisfy her burden to show "there is no evidence of a sufficiently substantial nature to support the court's findings." (*In re Hailey T.* (2012) 212 Cal.App.4th 139, 147.)

### D. *Perpetration of domestic violence*

Mother next challenges the a-2 and b-3 jurisdictional findings to the extent that they indicate mother personally perpetrated domestic violence in the home. Mother seeks an order that the jurisdictional findings should be revised to remove the language suggesting both mother and father engaged in violent altercations, broke and threw objects in the child's home, and that such violent conduct on the part of both parents endangers the child's physical health and safety. Mother argues there is no evidence in the record that mother endangered A.R. by perpetrating violence in the home. Mother points out the only evidence in the record attributed to specific perpetrators were committed by father or mother's ex-boyfriend. Mother concedes there is substantial evidence in the record that the parents

argued frequently and had a volatile relationship but argues this evidence does not support the finding that mother was the perpetrator of violence. We disagree, and find the evidence supports a reasonable inference that mother engaged in domestic violence.

The evidence in the record shows father informed Bills that there was domestic violence in the home. Bills reported father had disclosed domestic violence in the relationship between him and mother during and after her pregnancy. Father described the domestic violence as "throwing things" and yelling. Father was not specific as to which party was throwing things, and while father admitted hitting mother during and after her pregnancy, his statements did not negate the possibility that mother was responsible for perpetrating violence.

At the hearing, Nowak testified she had known mother since 2018 or 2019 while she was a counselor at SPY. While at SPY, mother and father got into a physical altercation and were asked to leave the location. During March 2024, mother said "things [get] broken in the[ir] apartment" during arguments. Mother did not specify who breaks things. Father admitted hitting mother, but was also vague about who threw things. Given the parents' failure to specify which party was breaking things, the court was justified in making an inference that mother was involved in this activity.

In addition, there was evidence that mother had a history of being aggressive. Nowak reported mother was seen kicking, punching, and hitting her prior partner at a drop-in center for SPY, and was asked to leave the location. Mother had "a history of being timed-out for violence" with friends and partners. From this evidence, the juvenile court was permitted to draw an

23

inference that the vague references to items being thrown and broken in the home involved mother.

To the extent mother denied engaging in violence, the juvenile court was entitled to reject that testimony. During the initial interviews, mother admitted to the social worker she and father yelled and called each other names. While she initially denied physical altercations, mother then described an argument from one week prior in which father grabbed her by the neck. Father also admitted to Bills that there was domestic violence between him and mother, and a neighbor complained the parents were always arguing. Despite this evidence, both parents later denied there was any hitting, denied that they threw things, and denied there was any violence in their relationship. Given the parents' changing testimony, the juvenile court was entitled to reject their denials.

Substantial evidence in the record supports the juvenile court's finding that both mother and father were responsible for domestic violence in the home. In analyzing substantial evidence, this court must draw all reasonable inferences from the evidence to support the findings, review the record in the light most favorable to the juvenile court's determinations, and recognize that issues of fact and credibility are within the province of the trial court. (*In re Cole L., supra*, 70 Cal.App.5th at p. 602.)[4] Given the parents' vague references to things being

---

[4]      The juvenile court's decision to order mother to a domestic violence program for victims does not undermine the court's finding that mother perpetrated domestic violence. Mother was a victim of domestic violence based on father's admissions of such violence. Mother has failed to show an abuse of discretion in the type of domestic violence program selected by the juvenile court. (See *In re Daniel B.* (2014) 231 Cal.App.4th 663, 675.)

thrown and broken, combined with mother's history of violence, the juvenile court did not err in reasonably inferring mother was a party responsible for such violence.

## II. The court's reasonable efforts and no reasonable means findings are supported by substantial evidence

At the disposition hearing, the juvenile court found DCFS made reasonable efforts to prevent A.R.'s continued detention and removal and there were no reasonable means to prevent his continued detention. Mother argues the court did not cite any specific evidence to support these findings and the record lacks substantial supporting evidence. Thus, mother argues, the disposition order must be reversed and remanded to the juvenile court to hold a new disposition hearing based on current circumstances. (Citing *In re H.B.* (2024) 106 Cal.App.5th 219, 245, 247).

### A. *Applicable law and standard of review*

Under section 361, subdivision (c)(1), a juvenile court may remove a child from a parent's physical custody where it finds, by clear and convincing evidence, that there is a substantial danger to the child's physical health, safety, protection, or physical or emotional well-being if the child were to be returned home, and there are no reasonable means to protect the child without removal from the parents' custody.

A juvenile court's dispositional order removing a child from a parent's custody is reviewed for substantial evidence. (*In re Hailey T., supra*, 212 Cal.App.4th at p. 146.) Where, as here, "a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true."

25

(*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011.) In doing so, we must "give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Id.* at pp. 1011–1012.)

### B. *Analysis*

Considering the record as a whole, substantial evidence supported the juvenile court's disposition order removing A.R. from parental custody and its findings that DCFS undertook reasonable efforts to prevent removal and no reasonable means existed to prevent his continued detention.

A.R.'s physical health was in jeopardy when the social worker arrived at the home for the first time. He had an untreated eye infection. When asked about the baby's eye, mother said she brought it up to the doctor the week before at the Venice Family Clinic. The baby was prescribed antibiotics; however, mother did not know where to go to get the antibiotics. Therefore, the infant's eye was not treated. Mother denied following up with the health clinic. Mother repeatedly held the baby without properly supporting his head and neck, attempted to feed the child a near-empty bottle, attempted to feed the child by propping the bottle on a blanket even after being told it was a choking hazard, and declined to burp the child. The baby's clothing was dirty and smelled of urine.

When the social worker informed mother A.R. needed medical attention, mother declined to accompany the social worker to the hospital. When law enforcement arrived, mother expressed concern about being arrested because she had to attend a concert. Mother denied the severity of A.R.'s condition and refused to attempt to soothe him while he was in the hospital. Mother chose to leave for Las Vegas instead of visiting

26

A.R. at the hospital. Ultimately, she never visited A.R. at the hospital nor did she collect him when he was ready to be discharged. A.R. was placed in foster care because neither parent came to the hospital to pick him up.

After A.R.'s initial placement in foster care, individuals involved in the case continued to express serious concerns about mother's ability to parent A.R. Lori M. reported "lots of concerns" and stated her belief there was no way mother could take care of the baby due to mother's mental health issues. Maternal great-grandmother opined that mother could barely take care of herself.

A.R.'s caregivers reported minimal contact from mother. In mid-April 2024, A.R.'s caregivers reported neither mother nor father had contacted them to ask about the baby since his placement. Between mid-April and May 2024, mother called A.R.'s caregiver about five times, but sometimes mother did not ask about the child.

During visits, mother required constant modeling of how to properly support A.R.'s head, how to soothe the infant, and how to bond with him. Mother did not want to hold A.R. at times, and during visits both mother and father had to be redirected to pay attention to the baby instead of the social worker. Both parents demonstrated limited knowledge about child development.

The evidence shows that despite the concerns with mother's parenting, DCFS made efforts to prevent A.R.'s detention. When A.R. was first taken to the hospital, the social worker encouraged mother to join A.R. The social worker telephoned mother from the hospital to encourage mother to soothe the baby. Mother declined. Mother was on her way to Las Vegas when the child was ready to be picked up from the hospital. Neither mother nor father picked up the child from the hospital. After A.R. was

placed in foster care, DCFS interviewed the parties extensively, and provided encouragement and modeling to attempt to get the parents to appropriately parent the child. The DI assisted mother in calling mental health providers, ensured mother had transportation to get to her mental health appointment, assisted the parents in completing their Regional Center applications, interviewed service providers about mother's mental health, monitored the parents' visits with A.R., made safety recommendations and modeled appropriate parenting. In spite of these efforts, DCFS continued to have serious concerns about the parents' ability to care for A.R. Where the evidence shows "the child would be in danger if allowed to reside with the parent" (*In re Henry V.* (2004) 119 Cal.App.4th 522, 525), continued detention from the parents is appropriate. The record supports the juvenile court's determination that DCFS used reasonable efforts to reunite A.R. with his parents and that there were no reasonable means to prevent his continued removal.

In determining A.R. was at risk in his parents' care, the juvenile court was permitted to consider A.R.'s very young age. (*In re N.R.* (2023) 15 Cal.5th 520, 558 ["It is reasonable for courts to infer that very young children require a substantial degree of close supervision."].) The court noted it would not be appropriate to place the child in the parents' care until "we get these issues addressed and get a better understanding of the capacity of the parents to be parents and protective of the child." The court ordered expert evaluations to determine whether "there are any issues that would prevent the parents from having the child in their care and appropriately raising the newborn child in light of mother's known mental health issues that were just sustained." The juvenile court acted reasonably in maintaining A.R.'s

detention until the court was satisfied the infant would be safe in mother's care.

Mother points to section 319, subdivision (f)(1), which provides, "The court shall also make a determination on the record . . . as to whether reasonable efforts were made to prevent or eliminate the need for removal of the child from their home . . . and whether there are available services that would prevent the need for further detention." Among the services to be considered are "case management, counseling, emergency shelter care, emergency in-home caretakers, out-of-home respite care, teaching and demonstrating homemakers, parenting training, transportation, and any other child welfare services . . . ." (*Ibid*.) Mother argues such services must be considered at disposition, and these are precisely the types of services the parents needed.

The juvenile court recognized the parents' need for services, noting, "I think we can all agree that it is not going to be sufficient to hand the parents a list of resources and say 'go forth and conquer' . . . . This is going to require a significant amount of effort on [DCFS's] part to provide the parents with supportive service and essentially hold them by the hand and walk them to those programs and help them with what they need to do." The court was fully informed as to the parents' needs, and the record supports the court's decision that there were no reasonable means, at the time of the disposition hearing, to eliminate the need for continued detention. However, the court implemented appropriate services in an effort to eliminate the need for detention in the future.

Mother argues referrals to such services should have been made promptly after the child was detained. (Citing *In re H.B., supra*, 106 Cal.App.5th at p. 246; see § 319, subd. (g) ["If a court orders a child detained, the court shall . . . order services to be

29

provided as soon as possible to reunify the child and their family, if appropriate."].) There is no indication on this record that the juvenile court was delinquent in ordering services. The parents made no effort to see the child within the first few weeks of his detention and managed only sporadic contact thereafter. DCFS diligently investigated the case and attempted to facilitate visits between the parents and child. The jurisdiction and disposition hearing took place approximately two months after A.R.'s initial detention, during which time DCFS maintained communication with the parents and attempted to assist them in numerous ways. "[T]he mere fact that more services could have been provided does not render [DCFS's] efforts unreasonable." (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 973.)

The evidence in the record supports the juvenile court's findings by clear and convincing evidence that DCFS made reasonable efforts to prevent detention, and at the time of the disposition hearing, there were no reasonable means to prevent continued detention.

## DISPOSITION

The judgment, and subsequent dispositional order, are affirmed.


                                        CHAVEZ, J.

We concur:


ASHMANN-GERST, Acting P. J.     RICHARDSON, J.

30